## AIRLINES TRANSP., Inc. v. TOBIN, Secretary of Labor.

### No. 6403.

United States Court of Appeals Fourth Circuit.

Argued June 23, 1952.

Decided July 24, 1952.

E. K. Powe and Eugene C. Brooks, Jr., Durham, N. C., for appellant.

Bessie Margolin, Asst. Sol., United States Department of Labor, Washington, D. C. (William S. Tyson, Sol., William A. Lowe and Harold S. Saxe, Attys., United States Department of Labor, Washington, D. C., and Beverley R. Worrell, Regional Atty., United States Department of Labor, Birmingham, Ala., on the brief), for appellee.

Before PARKER, Chief Judge, SOPER, Circuit Judge, and PAUL, District Judge.

SOPER, Circuit Judge.

This suit involves the question whether the employees of Airlines Transportation, Inc., are employees "engaged in commerce" within the meaning of § 6(a) of the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq.; and if so, whether they fall within the terms of § 13(a) of the Act which provides that § 6 shall not apply to any employee of an employer engaged in the business of operating taxicabs. It is conceded that Airlines Transportation is not complying with the minimum wage provisions of § 6 or the record-keeping provisions of § 11(c);

and the suit is brought by the Secretary of Labor under § 17 of the Act to restrain these violations. The District Judge found the employees to be covered by the Act and issued an injunction to restrain further violations.

Airlines Transportation is a North Carolina corporation whose principal office and place of business is located at Durham, North Carolina. It has contracted with three airlines, Eastern, Capital and Piedmont, which make twenty-six interstate flights per day into and out of the Raleigh-Durham Airport to provide airline passengers with transportation by motor vehicles between points in these cities designated by the airline companies and the airport which is located approximately fifteen miles from each of these cities.

■ Under these contracts the employer corporation maintained seven limousines of seven-passenger capacity, and employs a number of drivers and dispatchers to operate them. It is provided in the contracts that the limousines shall be used exclusively in this service in the course of which they transport airline passengers and their baggage and in addition a certain amount of freight, newspapers, airline personnel and property, and make as many trips as are necessary to provide convenient transportation to connect with incoming and outgoing flights.

The contracts expressly provide that Airlines Transportation shall be an independent contractor in every respect, but the airline companies shall have the right to specify the time and place of arrival and departure of the vehicles, the type of vehicle used and the uniform and discipline of the drivers. The ground transportation thus provided is not covered by the airline tickets but the charge is fixed by the contracts at $1.50 per one-way trip for passenger and baggage; and the availability of the service as a convenience to the passengers is announced by the schedules and by the agents of the airline companies. Agents of the airline companies and dispatchers of Airline Transportation are located in the airport and cooperate in respect to the names and locations of passengers desiring limousine service. Airlines Transportation also furnishes special service in the transportation of passengers when flight interruptions occur. Passengers may also find transportation between the airport and Raleigh and Durham by bus line or local taxicabs, but at least 50 per cent. of the airline passengers use the limousines.

Airlines Transportation contends that under this arrangement the interstate journey of airline passengers ceases and begins at the airport and the transportation of the passengers to and fro between the airport and the cities is a purely local intrastate activity within the State of North Carolina. It is pointed out that the limousine service is not absolutely necessary or indispensable to the completion of the interstate journey of the passengers and that the flow of commerce would not be interrupted if it were withdrawn since other methods are available which the passengers are free to choose if they see fit; and it is strongly urged that the business of the limousines cannot be distinguished from the interstate standpoint from that of local taxicab companies operating a regular stand at a railroad station in a city and carrying passengers to and from the station and nearby points which in United States v. Yellow Cab Co., 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010, was held not to be an interstate operation within the Sherman Act, 15 U.S.C.A. §§ 1–7.

In that case it was proved that many persons embark upon interstate journeys from their homes and offices by using taxicabs to transport them to the railroad station and conversely many persons complete their journeys from places outside the state by using taxicabs to take them from railroad stations to their homes and offices; but the court held that such transportation was too unrelated to interstate commerce to constitute a part of it within the meaning of the Sherman Act. The court said, 332 U.S. 230–231, 67 S.Ct. 1567:

"We hold, however, that such transportation is too unrelated to interstate commerce to constitute a part thereof within the meaning of the Sherman Act. These taxicabs, in transporting passengers and their luggage to and from Chicago railroad stations, admittedly cross no state lines; by ordi-

nance, their service is confined to transportation 'between any two points within the corporate limits of the City.' None of them serves only railroad passengers, all of them being required to serve 'every person' within the limits of Chicago. They have no contractual or other arrangement with the interstate railroads. Nor are their fares paid or collected as part of the railroad fares. In short, their relationship to interstate transit is only casual and incidental."

Parts of this statement are descriptive of the activities of the employer's business in this case; but the important difference remains that the limousines of Airlines Transportation serve only airline passengers and that its business is carried on and controlled under contractual relations with interstate carriers by air. This difference brings the case much closer in fact to a phase of the Yellow Cab case other than that which has just been outlined. One of the transactions of the defendants in that case, which was condemned as part of a conspiracy to restrain interstate commerce in violation of the Sherman Act, was an agreement that the conspiring corporations would not compete with Parmelee Transportation Company for contracts with railroads to transport passengers between railroad stations in Chicago. The railroads serving that city frequently contracted with interstate passengers to supply transportation between railroad stations, and Parmelee entered into contracts with the railroads to provide this transportation by special cabs carrying seven to ten passengers. Speaking of these contracts the court said: 332 U.S. 228–229, 67 S.Ct. 1566.

"The transportation of such passengers and their luggage between stations in Chicago is clearly a part of the stream of interstate commerce. When persons or goods move from a point of origin in one state to a point of destination in another, the fact that a part of that journey consists of transportation by an independent agency solely within the boundaries of one state does not make that portion of the trip any less interstate in character. The Daniel

Ball, 10 Wall. 557, 565, 19 L.Ed. 999. That portion must be viewed in its relation to the entire journey rather than in isolation. So viewed, it is an integral step in the interstate movement. See Stafford v. Wallace, 258 U.S. 495, 42 S.Ct. 397, 66 L.Ed. 735, 23 A.L.R. 229."

We think that the transportation of interstate passengers by the limousines of Airlines Transportation resembles the Parmelee arrangement much more closely than it does the carriage of passengers by taxicabs between the airport and the North Carolina cities. It is true that Parmelee furnished a connecting link from one part to another part of an interstate journey whereas Airlines Transportation deals with passengers only at the beginning or at the end of such a journey. But the arrangement for the carriage of the passengers is made by airline carriers and we think it may be said, paraphrasing the comment of the court in United States v. Yellow Cab Co., 332 U.S. at page 231, 67 S.Ct. 1560, that it is the common understanding that a traveler, intending to make an interstate journey by air, begins the interstate movement when he enters the limousine to be carried to the airport. It is a significant fact that passenger railroad stations are located for the most part in the heart of the cities whereas airports of necessity are located at a substantial distance therefrom so that it becomes well nigh essential for the airline companies to arrange for the transportation of passengers at reasonable rates between the airports and the cities that they serve. We differ from the contrary conclusions reached by the court in Cedarblade v. Parmelee Transportation Co., D.C.N.D.Ill., 94 F.Supp. 965.

See also United States v. Capital Transit Co., 325 U.S. 357, 65 S.Ct. 1176, 89 L.Ed. 1663, where it was held that passengers on bus and trolley lines in the District of Columbia which did not extend into Virginia were traveling in interstate commerce when they boarded the vehicles of these lines with the intention of getting off in the business district of Washington and boarding another bus operated by a different and independent company, under a joint arrange-

ment as to fares, to complete their journey across the Potomac to their places of work in government establishments in Virginia. The court said that the transportation furnished by the Capital Transit Company was part of a continuous stream of interstate transportation. Subsequently this decision was reaffirmed in 338 U.S. 286, 70 S.Ct. 115, 94 L.Ed. 93, where it was said that the court's decision in the Yellow Cab case did not conflict with its prior holding.

See also the decision of Judge Wyche in Walling v. Rockton & Rion Railroad, D.C. W.D.S.C., 54 F.Supp. 342, adopted as the opinion of this court in 4 Cir., 146 F.2d 111, where it was held that a railroad carrier operating wholly within the State of South Carolina and serving quarry owners by transporting their product to the Southern Railway for interstate shipment was engaged in commerce within the meaning of the Fair Labor Standards Act.

The foregoing discussion throws light on the additional defense of the employer that its business falls within the exception of § 13(a) of the Act to the effect that the provisions of §§ 6 and 7 shall not apply with respect to any employee of an employer engaged in the business of operating taxicabs. The differences between the business of the appellant and that of a taxicab company have already been made apparent. The limousines in transporting passengers to and from the airport are required to follow and may not depart from fixed and limited routes on a definite schedule between beginning and ending points which are fixed in advance without reference to the convenience of a particular passenger; and the arrangement is made under a contract with interstate air carriers to facilitate their interstate business. The taxicabs, on the contrary, operate without fixed routes or schedules and are at the service of the individual customer as to time and destination in order to serve his personal convenience.

It may be added that the working conditions of the employees in the two types of business differ in important respects. To a large extent taxi drivers are free to organize their own time and to select their own routes, and they are required to exercise considerable initiative to secure the necessary patronage; but the limousine drivers do the work laid out for them at a point of time upon specified routes.

It is true that in certain respects the business of Airlines Transportation is subject to state and municipal control of the North Carolina authorities, as is the business of taxi companies. This fact alone, however, does not alter the essential nature of the appellant's business. Interstate activities within a state must always be subject to a certain amount of local control so long as there is no unreasonable interference with the national interests. The State of North Carolina has delegated to its municipalities the authority to license taxicabs and to regulate their use on the public streets. A municipality may prevent the licensing and operation of a taxicab within its borders until it has been granted a certificate of necessity and convenience by the governing body of the municipality, and drivers may be required to secure a permit dependent upon their moral character and efficiency. Rates may also be regulated. See General Statutes of North Carolina § 20–87(c) and § 160–200(36a); Suddreth v. City of Charlotte, 223 N.C. 630, 27 S.E.2d 650; Victory Cab Co. v. City of Charlotte, 234 N.C. 572, 68 S.E.2d 433.

The municipalities of Raleigh and Durham have exercised the authority under these statutes to issue certificates of convenience and necessity to Airlines Transportation and empowered it to operate taxicabs to and from the airport, and it has fixed the routes to be used and the fares to be charged and the area wherein passengers should be taken on and left off; but in a number of respects provisions applicable to taxicab companies are expressly stated to be inapplicable to the type of operation conducted by the appellant; and accordingly the District Judge found that the city ordinances of the two cities provide different limitations on the operation of limousines within the cities than are applicable to the operation of taxicabs.

None of these local provisions can have the effect of altering the nature of the appellant's business or exempting it from the provisions of the Fair Labor Standards Act. Not only is this true, but the pro-

visions of Section 13(a) 12 of the Act exempting employees engaged in the business of operating taxicabs must be narrowly construed to those plainly and unmistakably within its terms, for otherwise the will of Congress will be frustrated. See Phillips, Inc., v. Walling, 324 U.S. 490, 493, 65 S.Ct. 807, 89 L.Ed. 1095.

Affirmed.