17-2438-cv
*Munoz-Gonzalez, et al. v. D.L.C. Limousine Serv.*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

August Term 2017

(Argued: May 24, 2018      Decided: September 19, 2018)

No. 17-2438-cv

_____

ALEJANDRO MUNOZ-GONZALEZ, on behalf of himself, individually, on behalf of all others similarly situated, SUSIE TOWNSEND, as administrator for the estate of DANUAL MARTIN, THOMAS ACHEAMPONG, KWAME GYAMFI, ABRAHAM WEINSTEIN, MICHAEL DEJOSEPH, TIMOTHY GEIGER, PETER BEFI, EDWARD DAPICE, RAYMOND A. BROOKS, RICHARD W. NOSHER, JR., DANIEL BENNETT LILIENFELD, EDWARD VASQUEZ, LEONARD A. DIMASE, JOHN A. ANDERSON, DENNIS SADDLEMIR, MICHAEL F. CURRAN, FRANK J. SAVARESE, EDWARD W. HENRY, MASSIMO NOVELLO, MAURICE PEARSON, DARRIN R. DEAN, ABDELOUAHAD BENOUARA, JOHN RICHARD TOCCO,

*Plaintiffs-Appellants,*

-v.-

D.L.C. LIMOUSINE SERVICE, INC., CHRIS THORNTON, individually, JOHN D'AGOSTINO, D'AGOSTINO, MELISSA THORNTON, individually,

*Defendants-Appellees.*

_____

1

Before:    LIVINGSTON, CHIN, *Circuit Judges*, FAILLA, *District Judge*.[1]

D.L.C. Limousine Service, Inc. ("DLC") runs a chauffeured car service in Westchester County, New York.   Much like taxicabs, DLC's cars pick up members of the public and, for a fare, take them to their requested destinations. Its drivers frequently work more than forty hours a week, but DLC does not pay them overtime.   Plaintiffs-Appellants, all former DLC drivers, brought this suit for overtime compensation under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq*.   The district court (Oetken, J.) granted summary judgment to DLC, holding that the FLSA's overtime requirement did not apply to DLC's drivers because DLC is "engaged in the business of operating taxicabs," 29 U.S.C. § 213(b)(17).   We agree.   Accordingly, the judgment is AFFIRMED.

FOR PLAINTIFFS-APPELLANTS:    JEFFREY R. MAGUIRE (Alexander T. Coleman, Michael J. Borrelli, *on the brief*), Borrelli & Associates, P.L.L.C., Great Neck, New York.

FOR DEFENDANTS-APPELLEES:    JOANNA SANDOLO (Daniel G. Walsh, *on the brief*), Belowich & Walsh LLP, White Plains, New York.

DEBRA ANN LIVINGSTON, *Circuit Judge*:

The Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq*., requires that employers pay employees one-and-a-half times their regular rate of pay for every hour exceeding forty each workweek.   *Id.* § 207(a).   Drivers employed by employers "engaged in the business of operating taxicabs" are exempt.   *Id.* § 213(b)(17).   D.L.C. Limousine Service, Inc. ("DLC") runs a chauffeured car

---

[1] Judge Katherine Polk Failla, of the United States District Court for the Southern District of New York, sitting by designation.

service that does not pay its drivers overtime. Lead Plaintiff-Appellant Alejandro Munoz-Gonzalez ("Munoz-Gonzalez"), a former DLC employee, has brought this case against DLC for overtime compensation under the FLSA. The district court granted DLC's motion for summary judgment, holding that DLC qualifies as "an employer engaged in the business of operating taxicabs." *Id.* On appeal, Munoz-Gonzalez argues that the district court misinterpreted the word "taxicab."

Having consulted dictionaries, the FLSA and other contemporaneously-enacted statutes, and related legal usage, we conclude that DLC is "an employer engaged in the business of operating taxicabs." *Id.* Three factors guide our understanding of what a "taxicab" is—namely, that it is: (1) a chauffeured passenger vehicle; (2) available for hire by individual members of the general public; (3) that has no fixed schedule, fixed route, or fixed termini. There is no genuine dispute that DLC's cars, vans, and SUVs meet this description, and so we conclude that DLC's drivers are "employed by an employer engaged in the business of operating taxicabs," *id.* § 213(b)(17). We therefore AFFIRM the judgment below.

# BACKGROUND

## I. Factual Background[2]

DLC runs a chauffeured car service in New York's Westchester County. Though one company, DLC operates under two names: DLC Ground Transportation Services and LSW Chauffeured Transportation ("LSW"). The latter charges higher fares and uses more expensive cars, the former is the source of most of DLC's business, and both share the same staff, dispatchers, drivers, and management.

DLC's fleet consists mostly of five-person cars, but it also has some SUVs, luxury vans, and mini-coaches. DLC's vehicles are not metered, nor do they have "Taxi" or "Vacancy" signs on their roofs. DLC's drivers must dress professionally in a black suit, white shirt, company tie, black shoes, and black socks. They may not choose their own jobs or pick up passengers who hail them from the street; DLC's central dispatch, which passengers call to arrange for pickup, assigns drivers all their jobs. Drivers take the passengers wherever they want to go, generally relying on in-car navigation systems for directions unless the

---

[2] Because we are reviewing this case on appeal from a grant of summary judgment to DLC, the facts outlined below are either undisputed or viewed in the light most favorable to Munoz-Gonzalez. *See, e.g.*, *Raspardo v. Carlone*, 770 F.3d 97, 111 (2d Cir. 2014).

customer directs the driver to take a different route. Most trips are local (less than seventy miles), but passengers may book longer trips within the tristate area. Passengers often prepay their fares before trips begin.

During the time at issue in this case, most of DLC's work came from trips originating at the Westchester County Airport, where it operated a taxi stand. Its contract with the Airport required it to list itself as an Airport Transportation Service and a Limousine Service in the NYNEX Yellow Pages. The second largest source of DLC's work came from passengers calling DLC's dispatcher to request pickup. DLC also received small portions of its business (less than 5% total) from contracts with:

(1) a local hotel that allowed DLC to keep a counter in its lobby to serve the hotel's guests, in exchange for DLC paying the hotel a commission for these rides; and

(2) PepsiCo to provide transportation to and from its offices as requested.

Finally, for some of its repeat customers, DLC would instruct its drivers to charge certain fixed rates, treat the passengers as "VIP[s]," and keep bottled water and newspapers in the car.

During the period relevant here, many of DLC's drivers worked more than forty hours every week, but DLC did not pay them overtime compensation. In 2003, a former driver sued DLC for overtime compensation under the FLSA.

DLC responded that it did not have to pay the driver overtime because, as "an employer engaged in the business of operating taxicabs," 29 U.S.C. § 213(b)(17), its drivers were exempt from the FLSA's overtime requirements. The United States District Court for the Southern District of New York agreed and dismissed the case. *See Cariani v. D.L.C. Limousine Serv., Inc.*, 363 F. Supp. 2d 637, 645, 649 (S.D.N.Y. 2005). Since *Cariani*, DLC has renamed its upscale car service to its current name, LSW, entered into its contracts with the local hotel and PepsiCo, and increased the size of its LSW fleet to as many as twenty-five cars.

## II.  Procedural History

On December 2, 2015, lead Plaintiff-Appellant Munoz-Gonzalez sued DLC in the United States District Court for the Southern District of New York. He and approximately twenty other named plaintiffs wish to represent a class of former DLC drivers who, like the plaintiff in *Cariani*, are seeking to recover overtime compensation under the FLSA. On July 12, 2017, the district court granted summary judgment to DLC. *See Munoz-Gonzalez v. D.L.C. Limousine Serv., Inc.*, No. 15-CV-9368 (JPO), 2017 WL 2973980 at *9 (S.D.N.Y. July 12, 2017) (Oetken, *J.*).

The FLSA does not define the word "taxicabs," but the Department of Labor's Field Operations Handbook (2016 ed.) ("Handbook") lists criteria to help

6

assess whether car services qualify for the taxicab exemption. Applying the Handbook's criteria, the district court concluded that even though DLC had some "recurrent contracts" during the relevant period with a local hotel and PepsiCo, DLC's drivers did not drive along "fixed routes" and DLC served primarily local needs, which, on balance, demonstrated that it operated as a taxicab company. *Id.* at *4–5. Munoz-Gonzalez argued that DLC is an "airport limousine service," which the Handbook distinguishes from a taxicab company, because most of its business comes from trips from the Westchester County Airport. The court disagreed, reasoning that DLC receives so much of its business from airport trips only because Westchester County has little need for taxicabs beyond shuttling passengers to and from transportation hubs. Finally, Munoz-Gonzalez contended that DLC is not a taxicab company because it assigns its drivers their jobs, advertises itself as a limousine service, and charges higher fees than ordinary taxicab companies. The district court concluded that these factors carry little weight because the Handbook does not list them.[3]

---

[3] Munoz-Gonzalez also sued for overtime under New York state law and for unpaid minimum wage under the FLSA. The district court granted DLC's motion for summary judgment on the former claim because the state law at issue is co-extensive with the FLSA; Munoz-Gonzalez voluntarily dismissed the latter claim without prejudice before final judgment was entered.

The district court entered final judgment on August 2, 2017.

**DISCUSSION**

We review *de novo* the district court's grant of summary judgment. *See Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 558 (2d Cir. 2012). Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "We may affirm on any ground the record supports, and are not limited to the reasons expressed by the district court." *Laurent v. PricewaterhouseCoopers LLP*, 794 F.3d 272, 289 (2d Cir. 2015).

Congress enacted the FLSA in 1938. *See* Fair Labor Standards Act of 1938, 52 Stat. 1060, 29 U.S.C. § 201, *et seq.* Sections 6 and 7 of the FLSA, respectively, require that employers pay covered employees a minimum wage and overtime pay. 29 U.S.C. §§ 206, 207. Section 13(b) of the FLSA exempts certain categories of employees from overtime but not minimum wage. This case concerns § 13(b)(17), the "taxicab exemption," which exempts from the overtime requirement "any driver employed by an employer engaged in the business of operating taxicabs." *Id.* § 213(b)(17). Congress enacted the taxicab exemption in 1949. *See* Fair Labor Standards Amendments of 1949, Pub. L. No. 81-393, § 11,

8

63 Stat. 910, 918.[4]   DLC concedes that it does not pay its drivers overtime compensation but argues that it does not have to because it qualifies for the taxicab exemption.   The legal issue before us, accordingly, is whether DLC is "engaged in the business of operating taxicabs."

# I

This Court has never interpreted the taxicab exemption before.   Both Munoz-Gonzalez's and DLC's briefs focus extensively on how the Department of Labor defines the taxicab exemption in its Handbook.   But they have skipped a crucial step.   "In statutory construction, we begin with the language of the statute.   If the statutory language is unambiguous and the statutory scheme is coherent and consistent — as is the case here — the inquiry ceases."   *Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1976 (2016) (internal citations, brackets, and quotation marks omitted) (quoting *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002)).   We therefore begin our analysis with the taxicab exemption's text and then turn to the FLSA's structure.

---

[4] The 1949 Act exempted all taxicab employees (not just drivers) from both minimum wage and overtime provisions (not just overtime).   *See* Fair Labor Standards Amendments of 1949, Pub. L. No. 81-393, § 11, 63 Stat. 910, 918.   But Congress changed the taxicab exemption to its current form in 1966.   *See* Fair Labor Standards Amendments of 1966, Pub. L. No. 89-601, § 206(b)(2), 80 Stat. 830, 836.

**A**

Whether DLC is in the "business of operating taxicabs" turns on the meaning of the word "taxicab." The FLSA does not define "taxicab," so "we give the term its ordinary meaning," starting our inquiry with contemporaneous dictionaries. *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1140 (2018) (interpreting a different exemption under § 13(b) of the FLSA) (quoting *Taniguchi v. Kan Pacific Saipan, Ltd.*, 566 U.S. 560, 566 (2012)); *see also In re WorldCom, Inc.*, 723 F.3d 346, 354 (2d Cir. 2013) (ascertaining the "ordinary meaning" of a statutory term with reference to contemporaneous dictionaries). Apart from ordinary meaning, we also assess how Congress and other courts and legislatures have used the same language. *See W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 88 (1991); *see also Morissette v. United States*, 342 U.S. 246, 263 (1952) ("[W]here Congress borrows terms of art in which are accumulated . . . legal tradition and meaning[,] . . . it presumably knows and adopts the cluster of ideas that were attached to each borrowed word . . . .").

*Webster's New International Dictionary: Unabridged* (2d ed. 1934) defines "taxicab" as "[a] passenger-carrying vehicle, usually a motor vehicle designed to seat five or seven persons, with or without a taximeter, maintained for hire on

10

public thoroughfares or at public stations or stands, but not operated on a schedule." *Id.* at 2587.[5] The Motor Carrier Act of 1935, which authorized the Interstate Commerce Commission ("ICC") to regulate motor carriers traveling in interstate commerce, supports this definition. The Act exempted from its operative provisions "taxicabs, or other motor vehicles performing a bona fide taxicab service, having a capacity of not more than six passengers *and not operated on a regular route or between fixed termini*." Pub. L. No. 74-255, § 203(b)(2), 49 Stat. 543, 545 (emphasis added). Thus, before enacting the taxicab exemption,

---

[5] By "not operated on a schedule," *Webster's* almost certainly meant that, unlike a bus or trolley, cars do not make stops at set locations at set times. This phrase thus refers to the *cars'* schedules, not whether *drivers* must report for work at set times.

To be sure, some dictionaries less contemporaneous than *Webster's* define "taxicab" a bit differently. *The Random House Dictionary of the English Language: Unabridged* (1966), for example, defines "taxicab" as "a public passenger vehicle, esp. an automobile, usually fitted with a taximeter." *Id.* at 1457. And the *Oxford English Dictionary*, cited by Munoz-Gonzalez, defines it as "[a] cab for public hire, fitted with a taximeter; *esp.* an automobile or motor-cab so furnished." 17 *The Oxford English Dictionary* 680 (2d ed. 1989). We conclude, however, that *Webster's* definition hits closest to the mark. *See, e.g.*, Antonin Scalia & Bryan Garner, *Reading Law* 70 (2012) ("Most common English words have a number of dictionary definitions . . . . [A court should] assume the contextually appropriate ordinary meaning unless there is reason to think otherwise."). *Random House*'s definition encompasses too much, as both city buses and subway cars qualify as "public passenger vehicles." And *Oxford*'s definition places far too much emphasis on the presence of a taximeter. We are loath to conclude that a taxicab loses its essence if the driver removes the taximeter, or that legislators would (or did) hinge FLSA overtime liability on the presence or absence of such a meter. *See, e.g.*, *Pettus v. Morgenthau*, 554 F.3d 293, 297 (2d Cir. 2009) (explaining that we evaluate the text of a statute from the perspective of a "*reasonable reader*" (emphasis added)).

11

Congress used the word "taxicabs" to refer to passenger vehicles available for hire by individual members of the general public that do not operate on regular routes.[6]

Other contemporaneous legal sources use a similar definition to Congress's. *Black's Law Dictionary* (4th ed. 1951) offered three rough equivalents:

- "[a] conveyance similar to a hackney carriage or old-fashioned hack or stage which is held for hire at designated places and has no regular schedule or route, but operates to carry passengers at any time to any point and subject to call." (citing *Jarrell v. Orlando Transit Co.*, 167 So. 664, 668 (Fla. 1936));

- "[a] motor driven passenger conveyance propelled by electric or gas power, held for public hire, at designated places, charging upon a time or distance basis, carrying passengers to destinations without following any fixed routes." (citing *Tuggle v. Parker*, 156 P.2d 533, 534 (Kan. 1945)); and

- "[a] vehicle subject to contract by person desiring special trip from one point to another without reference to any prescribed legal route." (citing *Jackie Cab Co. v. Chicago Park Dist.*, 9 N.E.2d 213, 215 (Ill. 1937)).

---

[6] To be sure, *Webster's* emphasizes the lack of a fixed schedule and Congress the lack of fixed route, but this is almost certainly a distinction without a difference. A car that does not drive along a fixed route would have difficulty keeping to a fixed schedule, and it is hard to imagine a business model in which a car would drive passengers along a fixed route at random times.

We also note that in 2002, Congress amended its definition of "taxicab service," as used in Title 49 of the U.S. Code, to include a requirement that taxicab companies, among other things, not "primarily provide transportation to or from airports." Real Interstate Driver Equity Act of 2002, Pub. L. No. 107-298, § 3(a)(3), 116 Stat. 2342, 2343 (codified at 49 U.S.C. §§ 13102(22)(A), (22)(B)(ii)). But this provision, enacted more than fifty years after the taxicab exemption, provides limited insight into the meaning of the word "taxicab" in 1949. *See, e.g.*, Scalia & Garner, *supra*, at 78 ("Words must be given the meaning they had when the text was adopted.").

*Black's Law Dictionary* 1631 (4th ed. 1951). And just three years after the taxicab exemption's enactment, the Fourth Circuit interpreted the word "taxicab" the same way. *See Airlines Transp. v. Tobin*, 198 F.2d 249, 252 (4th Cir. 1952) ("[T]axicabs . . . operate without fixed routes or schedules and are at the service of the individual customer as to time and destination in order to serve his personal convenience."); *see also Jones v. Giles*, 741 F.2d 245, 249 (9th Cir. 1984) ("[T]axicabs . . . do not use predetermined routes.").

*Webster's*, statutory usage, and other legal sources thus suggest several crucial factors to consider when determining whether the taxicab exemption applies. Focusing on these factors, a "taxicab" is: (1) a chauffeured passenger vehicle; (2) available for hire by individual members of the general public; (3) that has no fixed schedule, fixed route, or fixed termini.

**B**

We next test whether focusing on these factors fits with the FLSA's structure. *See, e.g., Sturgeon v. Frost*, 136 S. Ct. 1061, 1070 (2016) ("[T]he words of a statute must be read in their context and with a view to their place in the overall statutory scheme.") (quoting *Roberts v. Sea–Land Servs., Inc.*, 566 U.S. 93, 101 (2012)). We conclude that it does.

13

When Congress enacted the taxicab exemption, it also exempted from overtime any employee who:

- worked in connection with operating or maintaining canals or waterways;

- worked for a local bus or trolley company;

- worked as a seaman; or

- was subject to ICC regulation under § 204 of the Motor Carrier Act of 1935 (interstate bus and truck drivers), part I of the Interstate Commerce Act (railroad workers), or title II of the Railway Labor Act (airline employees).

Fair Labor Standards Amendments of 1949, Pub. L. No. 81-393, § 11; *see also* 29 U.S.C. §§ 213(a)(6), (a)(9), (a)(14), (b)(1), (b)(2), (b)(3) (1952).[7] The FLSA thus exempted employees throughout the transportation industry. *See also* 2 Michael B. Snyder, *Compensation and Benefits* § 16:30 (2018) ("Certain categories of transportation employees are exempt from the overtime provisions of the FLSA.").

This makes sense. The transportation industry was already regulated, so extending certain FLSA protections to transportation workers could have resulted in regulatory conflict. *See* 49 U.S.C. §§ 1 *et seq.*, 141 *et seq.*, 171 *et seq.*, 301 *et seq.*, 901 *et seq.* (1952) (giving the ICC jurisdiction over railroads, inland waterway

---

[7] Congress later repealed the local bus and trolley exemption. *See* Fair Labor Standards Amendments of 1974, Pub. L. No. 93-259, § 21(b)(3), 88 Stat. 55, 68.

transportation, motor carriers, air commerce, and water carriers). To take just one example, the Motor Carrier Act gave the ICC power to set maximum-hours requirements for bus and truck drivers, creating the possibility of a clash between ICC regulatory objectives and the FLSA's overtime requirement. *See* 49 U.S.C. § 302(c); 29 U.S.C. § 207 (1952); *see also Levinson v. Spector Motor Serv.*, 330 U.S. 649, 684 (1947) ("[T]o the extent that [the Administrator of the Wage and Hour Division of the Department of Labor] expands the jurisdiction of the Fair Labor Standards Act he must reduce the jurisdiction of the Commission under the Motor Carrier Act . . . ."). Similarly, states and municipalities regulated intrastate transportation like local buses, trolleys, and, crucially, taxicabs. *See, e.g.*, *Jones*, 741 F.2d at 249–50 (suggesting that Congress did not give the ICC jurisdiction over taxicabs in part for this reason). Absent the taxicab exemption, conflicts between federal overtime rules and local regulations could have arisen just as easily. For example, cities often regulate taxicab fares, *see, e.g.*, *Reed v. City of Waco*, 223 S.W.2d 247, 249 (Tex. Civ. App. 1949), and taxi drivers often work more than forty hours, *see, e.g.*, Graham Russell Gao Hodges, *Taxi! A Social History of the New York City Cabdriver* 87 (2007), so mandating overtime compensation for taxicabs could have forced municipalities to change their fare caps to keep cabbing profitable.

In short, we see nothing in the structure of the FLSA that requires us to reconsider our focus on the three factors outlined above. This definition comports with the ordinary, contemporaneous understanding of "taxicab" and appears consistent with the overall structure of the Act.

## C

That said, our Circuit has traditionally construed FLSA exemptions narrowly and against the employers asserting them, and Munoz-Gonzalez urges us to do the same today. *See, e.g.*, *Fernandez v. Zoni Language Ctrs., Inc.*, 858 F.3d 45, 48 (2d Cir. 2017). We cannot do so. In *Encino Motorcars*, the Supreme Court made clear that we must give FLSA exemptions "a fair (rather than a 'narrow') interpretation." 138 S. Ct. at 1142 (quoting Scalia & Garner, *supra*, at 363). Because "the limitations expressed in statutory terms [are] often the price of passage," *id.* at 9 (quoting *Henson v. Santander Consumer USA, Inc.*, 137 S. Ct. 1718, 1725 (2017)), we must interpret each FLSA exemption the same way we would any other statutory provision—with full attention to its text.

## D

In light of the preceding discussion, we conclude that there is no genuine dispute that DLC's drivers qualify for the taxicab exemption. First, DLC's fleet

16

consists of chauffeured passenger vehicles, including town cars, SUVs, and luxury

vans.[8]   Second, DLC's cars are available for hire by individual members of the

general public.   Third, DLC's cars take passengers wherever they want to go and

"do not cover fixed routes or adhere to fixed schedules" or fixed termini.   *Cariani*,

363 F. Supp. 2d at 644.   Accordingly, DLC's drivers qualify for the taxicab

exemption.[9]

II

Munoz-Gonzalez makes several arguments to the contrary, largely relying

on the Department of Labor's Handbook.   The Handbook, which the district

court relied on below, explains the scope of the taxicab exemption as follows:

> The taxicab business consists normally of common carrier transportation in small motor vehicles of persons and such property as they may carry with them to any requested destination in the community.   The business operates without fixed routes or contracts for recurrent transportation.   It serves the miscellaneous and predominantly local transportation needs of the community.   It may include such occasional and unscheduled trips to

---

[8] On its website, LSW also advertises "motor coach[es]" for "sightseeing" tours in New York City.   Assuming *arguendo* that these motor coaches might not qualify as taxicabs, drivers employed by DLC might not be covered by the taxicab exemption if they spent enough of their workweeks driving these coaches.   *See* 29 C.F.R. § 786.200 (interpreting the taxicab exemption not to cover employees who perform "work of a nature other than that which characterizes [this] exemption" for more than 20% of the workweek).   But there is no evidence in the record that any of the plaintiffs drove DLC's motor coaches, so we need not address this hypothetical issue.

[9] Both parties agree that Munoz-Gonzalez's state law claims are coextensive with his FLSA claims, so they fail for the same reasons.

or from transportation terminals as the individual passengers may request, and may include stands at the transportation terminals as well as at other places where numerous demands for taxicab transportation may be expected.

Handbook § 24h01. The Handbook also offers examples of non-taxicab work including, as relevant here, "driving, in connection with . . . an airport limousine service." *Id.* § 24h03(a)(4).

Drawing on the Handbook, Munoz-Gonzalez makes several arguments in favor of reversal. But to the extent that the word "taxicab" is ambiguous, the Department of Labor's Handbook lacks the force of law, and "is entitled to deference only to the extent that it has the 'power to persuade.'" *Chen v. Major League Baseball Properties, Inc.*, 798 F.3d 72, 83 (2d Cir. 2015) (quoting *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000)); *see also Gummo v. Vill. of Depew*, 75 F.3d 98, 108–09 (2d Cir. 1996) (observing that the Handbook "acknowledges that it does not have the force of law" and appears principally to interpret the requirements imposed by" the FLSA). We believe that the factors we focus on are consistent with the Handbook, but to the degree the Handbook emphasizes other factors or is inconsistent with the discussion here, we decline to defer to the Handbook. *See, e.g., Chen*, 798 F.3d at 83 ("[W]e decline to defer to the DOL's guidance to the extent that it conflicts with Congress's plain intent . . . ."). We nevertheless address each

18

of Munoz-Gonzalez's arguments in turn and conclude that none of them are persuasive.

First, Munoz-Gonzalez contends that DLC is not a taxicab company because it has contracts for recurrent transportation with PepsiCo and a local hotel, as well as accounts with various repeat customers. This means, he maintains, that DLC does not operate "without . . . contracts for recurrent transportation" and thus does not qualify for the taxicab exemption. Handbook § 24h01. We disagree. Contracts like DLC's with the local hotel have long been common in the taxicab industry. *See, e.g.*, Hodges, *supra*, at 19 (observing that the Waldorf Astoria earned $30,000 annually from this practice in the 1910s). Moreover, we disagree that a taxicab loses its essence if it enters into a few corporate contracts of the magnitude of those at issue here.

To be sure, a company that received virtually all its business from recurrent contracts and corporate clients might not be "available for hire by individual members of the general public" under our three-part definition. *See, e.g.*, *McKinney v. Med Grp. Transp. LLC*, 988 F. Supp. 2d 993, 1002 (E.D. Wis. 2013) (concluding that a car service was not a taxicab company because it received "ninety-five to ninety-eight percent of its business through these types of

contracts"). But DLC's so-called "recurrent contracts" during the relevant period constituted a negligible amount — less than 5% — of DLC's business. What matters is that DLC's cars were available for hire by individual members of the general public, and there is no genuine dispute that they were. We therefore disagree with Munoz-Gonzalez's contention that "a business's possession of *any* contracts for recurrent transportation . . . disqualif[ies]" its drivers from the taxicab exemption. Pls.-Appellants Br. 27.

Second, Munoz-Gonzalez argues that DLC does not serve the "predominantly local transportation needs of the community" because passengers sometimes travel long distances within the tristate area. Handbook § 24h01. But there is no genuine dispute that DLC's trips rarely exceed seventy miles, and we do not take the Handbook to mean that a taxicab never travels longer distances. In any event, Munoz-Gonzalez's argument here is self-defeating, at least in this geographical area, because drivers who predominantly travel across state lines would also be exempt from the FLSA's overtime requirement. *See* 29 U.S.C. § 213(b)(1) (exempting, via reference to 49 U.S.C. § 31502, any driver of a "motor carrier" that transports passengers across state lines, *id.* § 13501); *see also* Handbook

§ 24h05 ("If for any reason, taxicab drivers are not exempt . . . under section 13(b)(17), the possible application of section 13(b)(1) should not be overlooked.").

Finally, Munoz-Gonzalez argues that DLC is not "engaged in the business of operating taxicabs" because it really runs "an airport limousine service." *See* Handbook § 24h03(a)(4). This is so, in his view, because DLC's contract with the Westchester Airport requires it to list itself in the NYNEX Yellow Pages as an Airport Transportation Service and Limousine Service, up to 91% of DLC's business comes from trips leaving the Westchester County Airport, and passengers often pre-pay their fare. But Munoz-Gonzalez has misinterpreted the term "airport limousine service."

Although certain upscale luxury cars are commonly referred to as "limousines," a secondary definition for the word "limousine" is a vehicle "used to carry passengers *on a regular route*, as between an airport and a downtown area." *The American Heritage Dictionary of the English Language* 1016 (4th ed. 2000) (emphasis added). This is almost certainly what the Handbook means by "airport limousine service." After using the term "airport limousine service," the Handbook references back to an earlier section that describes "buses/shuttle services/limousines carrying interstate passengers and their baggage *to and from*

21

*transportation terminals*." Handbook § 24c04 (emphasis added). And just three years after the taxicab exemption was enacted, the Fourth Circuit distinguished "taxicabs" from "airport limousines" because the latter have "fixed routes" while the former do not. *Tobin*, 198 F.2d at 252. Indeed, if "airport limousine service" referred to cars available for hire by the public that frequently travel to or from an airport, it would be impossible to distinguish taxicabs from "airport limousines," as the Handbook itself notes that taxicabs "may [have] stands at . . . transportation terminals," including airports. Handbook § 24h01.

Accordingly, the Handbook uses the term "airport limousine service" to refer to shuttles that drive on a regular route between an airport and another location. The Handbook lacks the force of law and the term "airport limousine service" does not appear in the FLSA. But even setting these problems aside, DLC is not an airport limousine service for the same reasons that it *is* a taxicab company.

### III

Finally, departing from both the text of the FLSA and the Handbook, Munoz-Gonzalez argues that DLC is not a taxicab company because:

(1) it controls its drivers' work;

22

(2) its cars do not look like taxicabs; and

(3) it advertises itself as a luxury car company.

As these factors are neither among those highlighted in our earlier analysis nor are they featured in the Handbook, we consider them of limited importance. But because some other courts have found these factors relevant,[10] we explain below why, even setting aside the FLSA's text, the taxicab exemption *should not* turn on these factors.

First, the simple fact that DLC's dispatcher controls its drivers' assignments — and thus that customers cannot hail DLC cars from the street — does not cut against its being a taxicab company. Taxicabs have not always cruised for passengers, *see, e.g.*, Hodges, *supra*, at 72, and control over drivers bears on whether the drivers are independent contractors or employees, not the nature of DLC's business, *see, e.g.*, Restatement (Second) of Agency § 2 (1958). What is

---

[10] *See, e.g.*, *Abel v. S. Shuttle Servs., Inc.*, 301 F. App'x 856, 860–61 (11th Cir. 2008); *Wirtz v. Cincinnati, Newport & Covington Transp. Co.*, 375 F.2d 513, 514 (6th Cir. 1967) (per curiam); *Arena v. Plandome Taxi Inc.*, No. 12-CV-1078 (DRH), 2014 WL 1427907, at *9 (E.D.N.Y. Apr. 14, 2014); *June-Il Kim v. SUK Inc.*, No. 12-CV-1557 (ALC), 2014 WL 842646, at *5 (S.D.N.Y. Mar. 4, 2014); *McKinney v. Med Grp. Transp. LLC*, 988 F. Supp. 2d 993, 996 (E.D. Wis. 2013); *Powell v. Carey Int'l, Inc.*, 490 F. Supp. 2d 1202, 1206–07, 1213 (S.D. Fla. 2006); *Rossi v. Associated Limousine Servs., Inc.*, 438 F. Supp. 2d 1354, 1363 (S.D. Fla. 2006); *Mascol v. E & L Transp., Inc.*, 387 F. Supp. 2d 87, 98 (E.D.N.Y. 2005); *Herman v. Brewah Cab, Inc.*, 992 F. Supp. 1054, 1060 (E.D. Wis. 1998); *see also* Opinion Letter Fair Labor Standards Act (FLSA), 1998 WL 852774, at *1 (Apr. 17, 1998).

more, DLC requires its drivers to take assignments from a central dispatcher because municipalities in Westchester County prohibit taxicab drivers from picking up people from the street.

Second, DLC's cars should not fail to qualify as "taxicabs" simply because they lack "Taxi" or "Vacancy" signs and taximeters, or because DLC's drivers must dress professionally in black suits, white shirts, and ties. The appearance of the car and dress of the driver do not weigh heavily in our consideration. Both go more to the marketing of the business than the core operation of the business itself. Taxicabs have come a long way since the "hackney carriage" of old, and no reasonable legislator would have wanted the scope of the taxicab exemption to turn on a car's aesthetics or its driver's couture. *See also* Hodges, *supra*, at 8–9 (noting that one of New York City's first taxicab companies required its drivers to wear "a uniform designed to emulate a West Point cadet's"). In short, no one ordering a "taxicab" would think twice if one of DLC's chauffeured cars arrived to pick her up. *See, e.g.*, *Mohamad v. Palestinian Auth.*, 566 U.S. 449, 454 (2012) (interpreting a word's plain meaning with reference to how people "use the word in everyday parlance").

Finally, although DLC does indeed advertise some of its services in the Yellow Pages as luxury car transportation (or "Limousine Services") rather than taxicab transportation, we do not believe that this should matter either. A taxicab is a taxicab is a taxicab; how a company *markets* its services or products does not change what it *is* for purposes of the FLSA. The factors we have noted above provide the more appropriate focus for assessing the applicability of the taxicab exemption.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's judgment.