### WALLING v. W. D. HADEN CO.

No. 11302.

Circuit Court of Appeals, Fifth Circuit.

Jan. 18, 1946.

Rehearing Denied Feb. 18, 1946.

Bessie Margolin, Assistant Solicitor, U. S. Department of Labor, and Joseph M. Stone, Attorney, U. S. Department of Labor, both of Washington, D. C., and Earl Street, Regional Attorney, U. S. Department of Labor, of Dallas, Tex., for appellant.

Searcy Bracewell, J. S. Bracewell, and W. P. Hamblen, all of Houston, Tex., for appellee.

R. Emmett Kerrigan and Marian Mayer, both of New Orleans, La., amici curiæ.

Before SIBLEY, WALLER, and LEE, Circuit Judges.

SIBLEY, Circuit Judge.

The case concerns the application of the Fair Labor Standards Act to workers on dredge boats.

The appellee W. D. Haden Co., is engaged in dredging shell deposits, mainly oyster shells, from the ocean floor off Galveston Bay in the Gulf of Mexico, and transporting the material by barges drawn by tugs to several ports on the Texas coast where the shells are sold and delivered to manufacturers of lime, cement, and magnesium, and for coarse aggregate in concrete. The lime, cement and magnesium are sold and shipped by the manufacturers in large quantities into other States. Some of the shells are dredged on the coast of Louisiana and carried for sale to Texas. The dredging is done by machinery on the dredge boats which cuts up the shell deposit from the reef and sucks it up and delivers it upon a barge tied alongside the dredge, which when loaded is towed away by a tug and replaced by another. The dredge boat is stationed for months at a time in substantially the same spot, having no motive power of its own, save that it can by anchors pull itself from side to side in dredging and move itself short distances. Each dredge is manned by a Captain, a Chief Engineer and three assistants, three levermen, two oilers, two cooks, and several deck hands, who all eat and sleep on the dredge boat, working in two shifts of twelve hours each, twenty-four days per month, and having shore leave of three days at the end of every two weeks. None have licenses as marine officers, or have signed articles as seamen. All are paid by the month, whether work is constant or not, at a rate above the basic general rate which has been fixed for such workers under the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq., if it is applicable, but no account is taken of overtime beyond forty hours per week, nor are records kept which the Act requires. The appellant Administrator at first considered such dredge employees not subject to the Act, but later by an interpretive bulletin announced that while the men who work on the tugs and barges in marine transportation are excepted from the Act as seamen those working on the dredges are not. He thereupon sued for an injunction to compel appellee to keep the records and pay the wages required by the Act as to the employees on its

dredges. The facts were stipulated and some undisputed testimony heard. The district court found that in the dredging of shells in Louisiana and transportation of them to Texas those dredgemen are employed in commerce, but that the dredgemen in Texas are neither engaged in commerce nor producing goods for commerce notwithstanding the use the purchasers of the shells made of them. He also held all the dredgemen are seamen and exempted from the Act by Sect. 13(a) (3), 29 U.S.C.A. § 213(a) (3); but that the exemption in Sect. 13(a) (5) of the Act, 29 U.S.C.A. § 213(a) (5)', of persons who are engaged in taking, catching and harvesting aquatic animals and plants does not include those who dredge shells. From the judgment refusing an injunction the Administrator appeals.

■ 1. We think all the dredgemen, whether in the Louisiana or Texas operations, are engaged in producing goods for commerce and are under the Act if not exempted. Nearly half the shells dredged are habitually sold and delivered directly from the barges to four dealers who make and sell in large quantities in interstate commerce lime made directly from the shells, cement made seventy-five percent from the shells, and magnesium derived from sea water by using as a catalytic lime made from the shells. This is well known to appellee. The Act, 29 U.S.C.A. § 203(i), defines "goods" as meaning not merely "products, commodities, merchandise, or articles or subjects of commerce of any character" but also "any part or ingredient thereof." It is quite plain that the calcined shells are an ingredient of the lime and cement sold in commerce. And the shells are "produced", for the next definition, 29 U.S.C.A. § 203(j) declares that "produced" means not only manufactured but also "mined, handled, or in any manner worked." Dredging of shells from the sea floor is production of them under this definition. It is not made clear what becomes of the lime used in making magnesium, but as we understand the term catalytic, it means that the lime is a sort of chemical, conveyor or intermediary, and that none of it enters into the magnesium. It may therefore not be an ingredient. But if we exclude the shell sold for this use, that sold to make the lime and cement is clearly of such volume as to cause the producers of it to be engaged substantially in

producing goods for commerce as above defined, unless exempted from the Act.

■ 2. The exemption in Section 13(a) (5) is of "any employee employed in the catching, taking, harvesting, cultivating, or farming of any kind of fish, shellfish, crustacea, sponges, seaweeds, or other aquatic forms of animal and vegetable life * *." The shells here involved are not associated with living oysters, but are deposits estimated to be thousands of years old. They are therefore not forms of aquatic life, but the remains of life long ceased, as are coral rock and limestone. These dead remains are not intended to be the subject matter of this exemption. It is true that the word "crustacea" is derived from the Latin word for shell, but the English term as defined refers only to the animals which inhabit the shells. Webster's International Dictionary. All the words used in the exemption refer to living things.

3. The other exemption, 29 U.S.C.A. § 213(a) (3), is of "any employee employed as a seaman." The Act does not define "seaman". Webster's International Dictionary defines him as "one whose occupation is to assist in the management of ships at sea; a mariner". It quotes too the definition of R.S. § 4612, now 46 U.S.C.A. §. 713, "any person (apprentices excepted) employed or engaged to serve in any capacity on board a vessel". The term was used by Congress in the Merchant Marine Act of 1920, the Jones Act, 46 U.S.C.A. § 688, and on Oct. 18, 1926, International Stevedoring Co. v. Haverty, 272 U.S. 50, 47 S.Ct. 19, 71 L.Ed. 157, the Supreme Court held it includes stevedores, who do not live on shipboard, and work as much on land as on the ship. The following spring Congress passed the Longshoremen and Harbor Workers' Act approved March 4, 1927, 33 U.S.C.A. § 901 et seq. A seaman's union requested that they be excluded from the Act, preferring to remain under the provisions of the Jones Act. To effect their exclusion Congress did not except "seamen", but the "master or member of a crew of any vessel." 33 U.S.C.A. § 902(3). We think the latter expression narrower than the former since it does not include stevedores, for example. When in framing the Fair Labor Standards Act similar unions made a like request, Congress in complying with it used the broad term "seaman".

■ Now a dredge boat operating in navigable waters is a vessel subject to the

admiralty jurisdiction, required to show the lights and give the signals due by vessels; and the men working on it are in the general sense seamen entitled to enforce liens against it for wages and injuries.[1] The dredgemen here in question live on their vessel. They stand watches, and when on duty manage the anchor cables and barge lines, and often go with the tugs for empty barges. In case of storm or other emergency they can be called on for any service like the ordinary sailor. The cooks cook, and the deck hands clean and serve the vessel as other sailors do. They are paid without deduction though the dredge cannot work because of fog or storm or rough water or lack of a barge. The captain though unlicensed, is always an experienced local navigator, and two radio operators are kept to aid in safety measures. The Texas dredges work about fourteen miles from shore and beyond the jurisdiction of the State we assume. Since the Act does not define the word seaman, it must be taken in its ordinary meaning. If the exemption were of all seamen, we should be inclined to hold as did the district court, that these men are seamen.

But the words of the exemption are: "Employees *employed as* seamen". The italicized words mean something; they are not mere tautology. They warn us to look to what the employees do, and not to rest on a mere matter of a name, or the place of their work. The entire Act is pervaded by the idea that what each employee actually does determines its application to him. He himself must be engaged in commerce, or in producing goods for commerce, to come under the Act; and in most of the exemptions, as in this one, what he does is expressly made the test of exclusion. We lay no emphasis on the fact that these men are not "employed", in the sense of hired, as seamen usually are, by signing articles. The question is of the work they do after being hired. And it is of a mixed kind. Some of it, as we have pointed out above, is of a nautical kind, having to do with the management of the dredge boat and barges as vessels; and some is the mining and handling of shells as an industrial operation carried on by means of a floating mining plant. The dominant employment is clearly the industrial one, the production of shells. The maritime work is incidental and occasional, taking but a small fraction of the work time. These employees, while working on a boat anchored in navigable waters and in admiralty jurisdiction, are principally employed not as seamen but as shell miners. They are employed more in industry than in shipwork, and are not exempt.

The practical difficulties arising from shortened hours of work on the dredge boats are not insuperable. If overtime pay is desired to be avoided a larger number of men can be employed each week by organizing two double shifts, one double shift taking three days shore leave the first half of the week and the other taking a like shore leave the last half of the week, without enlarging the sleeping quarters on the dredge. That the Act causes hardships, sometimes to employers and sometimes to employed, cannot be denied, but it is the law. No such hardship appears here as to lead us to believe we have misunderstood its provisions. Since the decision of the court below was rendered, two Circuit Courts of Appeals have arrived at a similar result though on somewhat different reasoning.[2]

We are of opinion that the judgment denying an injunction was wrong, and it is reversed and the cause remanded for further proceedings not inconsistent with this opinion.

Reversed and remanded.

[1] City of Los Angeles v. United Dredging Co., 9 Cir., 14 F.2d 364; Butler v. Ellis, 4 Cir., 45 F.2d 951; Kibadeaux v. Standard Dredging Co., 5 Cir., 81 F. 2d 670; Pariser v. New York, 2 Cir., 146 F.2d 431.

[2] Walling, Adm'r, v. Great Lakes Dredge & Dock Co., 7 Cir., 149 F.2d 9; Walling v. Bay State Dredging Co., 1 Cir., 149 F.2d 346.