## McKIE v. DIAMOND MARINE CO.
### Civ. A. No. 5821.

United States District Court
S. D. Texas, Houston Division.

Feb. 13, 1952.

Mandell & Wright (Arthur J. Mandell), of Houston, Tex., for plaintiff.

Baker, Botts, Andrews & Parish (James K. Nance and William C. Harvin), of Houston, Tex., for defendant.

KENNERLY, Chief Judge.

Plaintiff, Roy Vernon McKie, was injured on or about February 15, 1950, while working on a dredge boat belonging to and operated by Defendant, Diamond Marine Company. He filed this suit against Defendant October 12, 1950.

The facts with respect to the filing of Plaintiff's claim under the Texas Workmen's Compensation Law, Vernon's Ann. Civ.St. art. 8306 et seq., and under the Longshoremen's and Harbor Workers' Act, 33 U.S.C.A. § 901 et seq., are stipulated as follows:

"1. That defendant, Diamond Marine Company, was at all material times herein a subscriber, as that term is defined in the Texas Workmen's Compensation Act, and said Company was insured under said Act.

"2. That on February 15, 1950, plaintiff was an employee of said defendant when he sustained an accidental injury in the course of his employment with defendant.

"3. (a) That plaintiff filed with the Industrial Accident Board of the State of Texas a 'Notice of Injury' pertaining to said accident of February 15, 1950, which was filed and received by said Board on June 15, 1950.

"(b) That plaintiff filed with said Board a 'Claim for Compensation for Injury', pertaining to said accident, which was received and filed by said Board on June 15, 1950.

"4. That following said accident of February 15, 1950, defendant's Workmen's Compensation carrier, beginning February 28, 1950, delivered to plaintiff, for 19 consecutive weeks, a weekly check in the amount of $25 (a total of $475). That plaintiff received and cashed each of said checks.

"5. That defendant's Workmen's Compensation carrier has paid medical,

hospital, nursing and drug bills incurred in the treatment of the injuries sustained by plaintiff herein, in the total amount of Eight Hundred Twenty-nine and 35/100 Dollars ($829.35).

"6. That defendant, at all material times herein, was insured under the Longshoremen's and Harbor Workers' Act.

"7. That plaintiff, on August 25, 1950, filed an 'Employee's Claim for Compensation' in connection with said accident of February 15, 1950, with the Office of Deputy Commissioner at Galveston, Texas, Federal Security Agency, Bureau of Employees' Compensation, which administers the Longshoremen's and Harbor Workers' Act."

The Statutes fix the compensation payable for injuries such as was Plaintiff's.

In this case, diversity of citizenship is neither alleged nor proven, and the grounds of jurisdiction of the Court are not clearly set forth in Plaintiff's pleadings. The case was tried, however, on the theory that it is a suit under the Jones Act, 46 U.S.C. A. § 688, and also in Admiralty, based on the claim that the dredge boat was unseaworthy. Plaintiff also sues in Admiralty for maintenance.

At the close of Plaintiff's evidence, Defendant moved that the case be dismissed, and in the alternative for a directed verdict, upon the claim that Plaintiff had failed to show a right to maintain the suit either under the Jones Act, in Admiralty, or otherwise. Such Motion to Dismiss was granted for the following reasons.

1:—The evidence produced by Plaintiff showed that he was not entitled to prosecute his case nor recover here under the controlling cases in the Fifth Circuit. United Dredging Co. v. Lindberg, 18 F.2d 453; Fuentes v. Gulf Coast Dredging Co., 54 F.2d 69; Kibadeaux v. Standard Dredging Co., 81 F.2d 670; Radcliff Gravel Co. v. Henderson, 138 F.2d 549; Walling v. W. D. Haden Co., 153 F.2d 196; and Pate v. Standard Dredging Corp., U.S.Dist.Ct. S.D.T., decided June 5, 1950, and appealed to Court of Appeals and reversed on other grounds. 193 F.2d 498.

2:—The dredge boat upon which Plaintiff was working when injured was not engaged in navigation, but in dredging, under a contract with an oil producing company to dredge, not in aid of navigation generally but a channel primarily for the use of such oil company. The owners of the dredge boat had from time to time other similar contracts. The dredge boat was not engaged in transportation and did not transport either passengers or freight. She had no power of her own, but was dependent upon being towed about by tugs or other power boats. She had no sleeping quarters for her employees aboard and no facilities aboard for feeding her employees. Plaintiff lived, ate, and slept at his home on land except that he sometimes carried his own lunch and ate it on the dredge boat. Generally speaking, he was not on the dredge boat except when working.

3:—Plaintiff's work on board the dredge boat was not that of a seaman. He was engaged in operating or helping to operate the machinery which dredged the channel. He was so engaged when injured. True, he at times had something to do with the operation of the boats which towed the dredge boat about, but this was incidental to the duties for which he was employed, i. e., operating or helping to operate the machinery in dredging the channel. In the absence of the so-called Captain of the dredge boat, Plaintiff was in charge of operations and of other employees during the daily period during which he worked.

4:—Plaintiff's injury occurred while the dredge boat was working in Tabbs Bay. It is not clear to what extent Tabbs Bay was originally navigable. Parts of it were rather shallow and perhaps swampy. Beginning some years ago, presumably on permits issued by the State of Texas, many wells for the production of oil and gas were from time to time drilled and are still being drilled therein. Scores and perhaps several hundred of these wells, some productive and some not, are shown by the map in evidence referred to as Exhibit 5. This map shows not only the wells, but some subdivisions by the State. The various oil companies, or some of them, which from time to time drilled these wells em-

ployed dredges such as was Defendant's dredge to dredge out channels, not to aid navigation generally, but so that they could transport drilling machinery and other supplies, etc., to their drilling sites. The dredging of such channels rendered more of Tabbs Bay navigable than it was originally. In view of the evidence describing the location where the dredge boat was at the time Plaintiff was injured, including the fact that they were dredging through the timbers, etc., of an old oil well, I am unwilling to say that the dredge at the time Plaintiff was injured was operating in navigable waters. It is certain that it was not cleaning out a channel as was the dredge boat in the Kibadeaux case (Kibadeaux v. Standard Dredging Co., supra), but was cutting a new channel.

5:—The distinction between operations such as we have in this case and those that existed in the Kibadeaux case, 81 F.2d 670, 671, are stated by Judge Sibley in the Opinion in the Kibadeaux case:

"The question therefore recurs whether Kibadeaux has a remedy in admiralty in view of the state Compensation Act and the Longshoremen's Act. The competition between these three jurisdictions often presents a puzzle. The agreed facts show that Standard Dredging Company had taken proper steps to place itself under each of the two last-named acts so far as they may be applicable, and it appears that their dredging operations included from time to time not only work in established waterways, but also the making of new ones. The latter kind of work done by a dredge, as well as that done merely to improve the shore, this court has held not to be so related to navigation as to bring employees while engaged in it under admiralty jurisdiction. United Dredging Co. v. Lindberg (5 Cir.) 18 F.2d 453; Fuentes v. Gulf Coast Dredging Co. (5 Cir.) 54 F.2d 69. Indeed, injuries occurring on waters which are to become navigable after the dredge cuts a channel, but which have never been navigated before, could hardly be said to occur on navigable waters at all."

What is said by Judge Sibley about dredge boat workers in Walling v. W. D. Haden Co., supra [153 F.2d 199], is also interesting:

"We lay no emphasis on the fact that these men are not 'employed', in the sense of hired, as seamen usually are, by signing articles. The question is of the work they do after being hired. And it is of a mixed kind. Some of it, as we have pointed out above, is of a nautical kind, having to do with the management of the dredge boat and barges as vessels; and some is the mining and handling of shells as an industrial operation carried on by means of a floating mining plant. The dominant employment is clearly the industrial one, the production of shells. The maritime work is incidental and occasional, taking but a small fraction of the work time. These employees, while working on a boat anchored in navigable waters and in admiralty jurisdiction, are principally employed not as seamen but as shell miners. They are employed more in industry than in shipwork, and are not exempt."

My view is that Plaintiff was employed more in industry than in shipwork, and may not maintain this suit.