# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

September 30, 2021

Lyle W. Cayce
Clerk

No. 19-30907

William Adams,

*Plaintiff—Appellant*,

*versus*

All Coast, L.L.C.,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 6:16-CV-1426

ON PETITION FOR REHEARING EN BANC

(Opinion February 11, 2021, 988 F.3d 203)

Per Curiam:

The court, having been polled at the request of one of its members, and a majority of the judges who are in regular active service and not disqualified not having voted in favor (Fed. R. App. P. 35 and 5th Circ. R. 35), the petition for rehearing en banc is DENIED.

In the en banc poll, two judges voted in favor of rehearing (Judges Jones and Elrod), and fifteen judges voted against rehearing (Chief Judge Owen, and Judges Smith, Stewart, Dennis, Southwick, Haynes, Graves, Higginson, Costa, Willett, Ho, Duncan, Engelhardt, Oldham, and Wilson).

It is ORDERED that our prior panel opinion, *Adams v. All Coast, L.L.C.*, 988 F.3d 203 (5th Cir. 2021), is WITHDRAWN and the following opinion is SUBSTITUTED therefor.

\* \* \* \* \*

Before SMITH, CLEMENT, and OLDHAM, *Circuit Judges*.

EDITH BROWN CLEMENT, *Circuit Judge*:

William Adams filed this collective action on behalf of himself and others employed on All Coast's fleet of liftboats. Although All Coast hired Adams and the other plaintiffs to serve in various maritime jobs, the employees claim they spent most of their time doing something completely terrestrial: using cranes attached to the boats to move their customers' equipment on and off the boats, the docks, and the offshore oil rigs.

All Coast did not pay the plaintiffs overtime because it classified them as seamen, who are exempt from the overtime pay rules in the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.* Persuaded by All Coast's reading of the FLSA, the district court entered summary judgment for All Coast because the employees' work served the liftboats' operation "as a means of transportation." 29 C.F.R. § 783.31. We disagree. Such a reading strays from the statutory and regulatory text and our jurisprudence. As we explain below, All Coast was not entitled to summary judgment. Accordingly, we reverse and remand.

I.

All Coast hired Adams as an able-bodied seaman to work on its fleet of liftboats that service offshore oil and gas platforms in the Gulf of Mexico.[1]

---

[1] "A lift-boat is a self-propelled, self-elevating, offshore supply vessel. Although it functions and navigates much like any other supply vessel, a typical lift-boat is equipped

No. 19-30907

But despite his job title, Adams maintains that his main duty had nothing to do with maritime work.  Instead, Adams spent much of his time operating a hydraulic crane to move personnel and equipment between the liftboat and the dock, offshore worksite platforms, and other vessels, as well as on the liftboat itself.  Adams claims that because he was really a crane operator and not a seaman, All Coast owes him unpaid overtime wages under the FLSA.

Adams filed a collective action on behalf of himself and other similarly-situated All Coast mates, deckhands, ordinary seamen, and able-bodied seamen, who all say their job titles hide their true task: crane operator.  Along with the crew members, liftboat cooks joined the class, alleging that they too are entitled to overtime pay since they spent their time cooking for third parties and these allegedly non-seamen crew members.

Adams and the other crew member plaintiffs say they spent no less than 80 percent of their time in the jacked-up, stationary position.  Indeed, for some jobs or "hitches," the boats were jacked up 100 percent of the time.  And regardless the duration of the hitch, they never used the cranes when the boats were underway.  All told, the district court found that the plaintiffs "spent between 25% and 90% of their day operating the crane."  The plaintiffs all ate, slept, and worked aboard a boat.  And, when they weren't operating the cranes, they performed traditional maritime functions under the command of the boat's captain.

The plaintiffs claim their work servicing offshore oil and gas wells consisted of "the types of things that anyone engaged in oil and gas exploration does regardless of whether drilling onshore or offshore."  All Coast job tickets list tasks like "Coil tubing ops," "Crane ops," "Working

---

with three column-like legs that can be quickly lowered to the seafloor to raise the vessel out of the water and stabilize it for marine operations." *Naquin v. Elevating Boats, L.L.C.*, 744 F.3d 927, 930 n.1 (5th Cir. 2014); *see* 46 C.F.R. § 90.10–20 ("Liftboat means an offshore supply vessel with moveable legs capable of raising its hull above the surface of the sea.").

3

with divers," and "Working with welders." Similarly, the plaintiffs' deposition testimony explains how they used the cranes to hold coil tubing units in place for their customers on oil rigs, and to lower divers into the water and retrieve equipment the divers placed into the crane basket. On the other hand, the record also makes plain that the crew never stepped foot on the oil platforms, nor did they directly drill for oil and gas.

All Coast did not pay the crew and cooks overtime because it classified them as exempt seamen under the FLSA. *See* 29 U.S.C. § 213(b)(6). All Coast first filed a motion to dismiss, which the district court converted to summary judgment and then denied as premature. But the district court later granted summary judgment for All Coast. The court found that the cooks were exempt seamen because All Coast crew members ate at every meal the cooks prepared. And although the crew spent as much as 90 percent of their time operating the cranes, they too were exempt seamen because the liftboat crane operation was a "service which is rendered primarily as an aid in the operation of such vessel as a means of transportation." 29 C.F.R. § 783.31. Plaintiffs timely appealed.

## II.

We review a grant of summary judgment de novo, "applying the same legal standards as the district court." *Petro Harvester Operating Co., L.L.C. v. Keith*, 954 F.3d 686, 691 (5th Cir. 2020). "Summary judgment is appropriate when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *United States v. Nature's Way Marine, L.L.C.*, 904 F.3d 416, 419 (5th Cir. 2018) (quoting FED. R. CIV. P. 56(a)).

In a dispute about an FLSA exemption, the employer has the burden of establishing that the exemption applies by a preponderance of the evidence. *Faludi v. U.S. Shale Sols., L.L.C.*, 950 F.3d 269, 273 (5th Cir. 2020). The Supreme Court has "clarified that courts are to give FLSA exemptions 'a fair reading,' as opposed to the narrow interpretation

previously espoused by this and other circuits." *Carley v. Crest Pumping Techs., L.L.C.*, 890 F.3d 575, 579 (5th Cir. 2018) (quoting *Encino Motorcars, L.L.C. v. Navarro*, 138 S. Ct. 1134, 1142 (2018)).

## III.

The FLSA's baseline requirement is that any employee who works "longer than forty hours" in a workweek must be compensated "at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). "An employee is not protected by this broad prohibition, however, if he falls within an exemption." *Coffin v. Blessey Marine Servs., Inc.*, 771 F.3d 276, 279 (5th Cir. 2014). Among them, "any employee employed as a seaman." 29 U.S.C. § 213(b)(6). Although the FLSA does not define "seaman," we determined shortly after the FLSA's enactment that the exemption applies only when an employee performs nautical *duties*:

> Since the Act does not define the word seaman, it must be taken in its ordinary meaning. . . . [T]he words of the exemption are: "Employees *employed as* seamen." The italicized words mean something; they are not mere tautology. They warn us to look to what the employees do, and not to rest on a mere matter of a name, or the place of their work. The entire Act is pervaded by the idea that what each employee actually does determines its application to him.

*Walling v. W.D. Haden Co.*, 153 F.2d 196, 199 (5th Cir. 1946).

Even so, our later decisions have recognized that the statute has its limits. For that reason, we look "primarily" to the Department of Labor's regulations, "which we have held to be entitled to great weight." *Coffin*, 771 F.3d at 279 (citing *Dole v. Petroleum Treaters, Inc.*, 876 F.2d 518, 521 (5th Cir. 1989)); *see Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 297 (1985) (describing the regulation's definition of "business purpose" under the FLSA as "entitled to considerable weight in construing the Act"). According to those criteria, an employee is a seaman if: "(1) the employee is

subject to the authority, direction, and control of the master; and (2) the employee's service is primarily offered to aid the vessel as a means of transportation, provided that the employee does not perform a substantial amount of different work." *Coffin*, 771 F.3d at 281 (citing 29 C.F.R. § 783.31).

The parties do not dispute the first part of the test. There is no doubt that the employees all ate, slept, and worked aboard the vessels and were subject to a captain's authority. The dispute revolves around the second prong, particularly whether using a crane aids in a liftboat's operation *as a means of transportation*. The district court concluded that it did: "The amount of time the plaintiffs spent operating the crane, whether 10% of their time or 100%[,] is irrelevant because crane operation is seaman's work that aids the vessel as a means of transportation." That conclusion runs contrary to the regulatory language and our decisions interpreting it.

### A.

One salient example in the regulation says that "assisting in the loading or unloading of freight at the beginning or end of a voyage" is not "connected with operation of the vessel as a means of transportation." 29 C.F.R. § 783.32. Another explains that "employees on floating equipment who are engaged in . . . construction . . . and employees engaged in dredging operations or in the digging or processing of sand, gravel, or other materials are not employed as seamen within the meaning of the Act but are engaged in performing essentially industrial or excavation work." *Id.* § 783.34. By the regulation's plain language, when the crew assists with loading or unloading, or with "essentially industrial" tasks, that portion of their time is not seaman's work.

The record shows that the plaintiffs spent a significant amount of time doing just that. Based on the plaintiffs' depositions, the district court found that they "spent between 25% and 90% of their day operating the crane" "to transport personnel, supplies, and equipment back and forth between the

liftboat and the dock, the liftboat and the worksite platform, the liftboat and other vessels, and within the liftboat itself." And other deposition testimony confirms that the crew members used the cranes only when the liftboats were stationary, never underway. In short, the plaintiffs performed "loading or unloading of freight at the beginning or end of a voyage." 29 C.F.R. § 783.32.

Nor does the regulation suggest anything unique about the plaintiffs' loading and unloading that would lead us to a different conclusion. The regulation recognizes that *all* vessels will have cargo on board during transport. Yet the work of handling that cargo does not qualify as seaman's work. The district court found that All Coast's customers chartered the liftboats "to transport people and equipment on the liftboat to a worksite offshore." Hardly a unique task for a seagoing vessel. But contrary to All Coast's argument, the regulation suggests there is nothing special about the nature of All Coast's charters that would pull crane operations into the vessel's ambit "as a means of transportation." 29 C.F.R § 783.31. Consider the alternative. If that were so then *all* loading and unloading would qualify as seaman's work. Yet the regulation says the opposite. If anything, the use of a hydraulic crane makes the work less like a typical seaman's, not more.

Recall too that All Coast's customers chartered the liftboats to support their industrial activity at offshore rigs. The plaintiffs used the cranes to support divers and hold coil tubing units in place. To be sure, the plaintiffs were not the divers or the welders. But they were akin to support crew that allowed the divers and welders to perform their industrial work. We would not say—indeed, we have not said, *see* section III.C, below—that these plaintiffs were engaged in seaman's work if they performed the same functions from the rigs themselves. Why should that conclusion change because they stayed on the liftboats? The inquiry is "the character of the work" the plaintiffs did, "not on what it is called or the place where it is performed." *Coffin*, 771 F.3d at 280 (quoting 29 C.F.R. § 783.33); *see* 29 C.F.R. § 783.34.

No. 19-30907

Regardless, All Coast argues that "crane operation was one of many fully integrated seaman's duties that aided in the safe operation of the vessel as a means of transportation of personnel and equipment." Instead of consulting the Department of Labor's guidance, which All Coast urges "does not have the force of law and is persuasive only," All Coast refers the court to dictionary definitions of "seaman" from the time of the FLSA's enactment.[2]

This court often looks to dictionary definitions to determine the ordinary meaning of key statutory terms. Indeed, in *W.D. Haden*, we consulted the same Webster's definition that All Coast proffers here: "one whose occupation is to assist in the management of ships at sea; a mariner." *W.D. Haden*, 153 F.2d at 198 (quoting *Seaman*, Webster's New Int'l Dictionary (2d ed. 1934)). But, as we have said, this court has long looked to the Department of Labor's regulations too, precisely because the meaning of "seaman" is undefined in the statute. *Coffin*, 771 F.3d at 279.

And the definitions that All Coast cites do not dissuade us from our normal interpretive methods. Black's Law Dictionary said that a seaman must "in some capacity assist in [a ship's] conduct, maintenance, or service." *Seamen*, Black's Law Dictionary (3d ed. 1933). Similarly, the

---

[2] All Coast primarily takes aim at the Department of Labor's guidance that work other than seaman's work is substantial if it accounts for more than 20 percent of an employee's work hours. *See* 29 C.F.R. § 783.37; *see also Coffin*, 771 F.3d at 281. We take up that argument in section III.D, below. However, we have also considered All Coast's criticism as targeting the portion of the regulation delineating seaman's work. All Coast relies on the Second Circuit's opinion in *Munoz-Gonzalez v. D.L.C. Limousine Service, Inc.*, 904 F.3d 208 (2d Cir. 2018). But *Munoz-Gonzalez* concerned the Department of Labor's Handbook, not its regulations. *See id.* at 216 ("[T]he Department of Labor's Handbook lacks the force of law, and 'is entitled to deference only to the extent that it has the 'power to persuade.'" (quoting *Chen v. Major League Baseball Props., Inc.*, 798 F.3d 72, 83 (2d Cir. 2015))). In contrast, of course, we have repeatedly emphasized that the Department's regulations are entitled to "great weight." *Coffin*, 771 F.3d at 279 (citing *Dole*, 876 F.2d at 521). Finding no conflict here between the statute's plain meaning and the regulatory guidance, we will continue to give them that weight.

No. 19-30907

Oxford English Dictionary said that a seaman's "occupation or business is on the sea," but, "Also, with qualifying word: One skilled in navigation." *Seaman*, Oxford English Dictionary (1st ed. 1933). Of these, only the first, unqualified, Oxford definition might support All Coast's reading of the term "seaman," but only then because of its breadth. "That a definition is broad enough to encompass one sense of a word does not establish that the word is *ordinarily* understood in that sense." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 568 (2012). Instead, the ordinary meaning from this survey of definitions reinforces the Department's regulations: a seaman's duty must serve the ship's operation *as a ship*.

When read in concert, the natural reading of those regulations is that these plaintiffs were engaged in seaman's work when they performed their nautical duties, but not when using the hydraulic cranes. During the periods when they were underway, the crew performed only the nautical duties listed in their job descriptions.[3] But when the liftboats were jacked up, the crew spent more time operating the cranes than performing their nautical tasks. Thus, the plain meaning of 29 C.F.R. § 783.31, and the illustrative examples in §§ 783.32 and 783.34, suggest the employees were not engaged in seamen's work when operating the cranes.

## B.

### 1.

Our previous decisions only reinforce that conclusion. The district court primarily focused its analysis on two of our cases analyzing the seaman exemption for plaintiffs who performed loading and unloading duties. In *Owens v. SeaRiver Maritime,* this court held that a tankerman who primarily

---

[3] Among those duties, the crew stood lookout, checked the engine room, attached lifting devices to cables, spliced rope, cleaned and painted, steered the boat, and performed other traditional maritime duties related to navigation and upkeep. In addition, one job description in the record notably lists the position as FLSA Non-Exempt. Neither party explains that contradiction, so we do not address it.

9

No. 19-30907

loaded and unloaded petroleum products from a permanently moored barge was not a seaman. 272 F.3d 698, 704 (5th Cir. 2001). But then in *Coffin*, we distinguished *Owens* and held that vessel-based tankermen who loaded and unloaded liquids were exempt seamen. 771 F.3d at 282–84. The district court reasoned that this case is closer to *Coffin*.[4] We disagree.

The plaintiff in *Owens* was an experienced tankerman who had been reassigned from seagoing vessels to a stationary landing barge, which was an old oil barge that was removed from navigation and permanently moored. 272 F.3d at 700. The employees who worked on the landing barge loaded and unloaded the petroleum product like a towboat crew. But unlike a normal barge, the landing barges were never towed or attended by a boat crew. The court noted that the skills the tankerman used on the landing barge "were similar to those he used when he was a towboat crewman, although [he] attended the [landing] barges only for the purposes of loading and discharging the product." *Id.* The court held that the tankerman's loading and unloading duties did not "aid in the operation of [a] vessel as a means of transportation." *Id.* at 704 (quoting 29 C.F.R. § 783.31); *see also id.* ("Workers who are primarily concerned with loading and unloading cargo are not, generally speaking, seamen." (citing 29 C.F.R. § 783.36)).

The defendant company in *Owens* argued that the loading and unloading was seaman's work because "if a barge was loaded or unloaded improperly it could not be safely moved or towed, and could even break apart." *Id.* The court rejected that "extremely broad and unsupportable construction of 'aid in the operation' of a 'vessel as a means of transportation.'" *Id.*

> Of course, the unloading and loading would have to be done in a safe or proper way, but that only *prepares* the vessel for

---

[4] The district court also considered *Johnson v. Canal Barge*, 181 F. Supp. 3d 413 (S.D. Tex. 2016). There, the district court followed *Coffin* in holding that a vessel-based tankerman was a seaman despite his loading and unloading duties. *Id.* at 418.

navigation; it does not aid in its actual *operation* as a means of transportation. A rule that includes within the definition of "seaman's work" for FLSA purposes all work that prepares a vessel for navigation would include quite a few activities, most of which would not fit comfortably within a commonsense definition of "seaman's work." And, [this] broad definition of "seaman's work" neglects the primary purpose of the loading and unloading—to get cargo on or off the barge. Even though Owens's loading and unloading duties were technical, specialized, and had to be done properly in order to assure proper navigation of the barge, they were still primarily cargo loading and unloading duties.

*Id.*; *see also id.* at 704 n.6 (noting that under the defendant's definition, "a land-based worker who installs navigation equipment on vessels would be a seaman, as would a worker at a refueling dock—both tasks . . . aid in the operation of a vessel as a means of transportation to the same degree as loading or unloading cargo").

In contrast, we held that the vessel-based tankermen in *Coffin* were seamen. There, the company was also in the business of shipping liquid cargo on barges. *Coffin*, 771 F.3d at 278. The crew—including the plaintiff tankermen—lived and worked on the towboat and answered to the captain. The tankermen were responsible for the duties of a deckhand plus the "complex" process of loading and unloading the liquid from the barges. *Id.* Those tankermen argued that their duties associated with loading and unloading were nonseaman work, "while acknowledging their many other duties" were those of a seaman. *Id.* at 279.

After identifying the Department's criteria in 29 C.F.R. § 783.31, the court rejected another proposed categorical rule. Just as the court had refused to adopt a "broad and unsupportable" construction of the regulation in *Owens*, 272 F.3d at 704, the court similarly declined the tankermen's argument that "loading and unloading a vessel is *always* nonseaman work," *Coffin*, 771 F.3d at 280. Instead, the court emphasized that "we *always*

consider the factual context when deciding whether an employee is exempt." *Id.* The court then highlighted that this is a case-specific inquiry:

> While the DOL regulations suggest that in many cases loading and unloading duties are nonseaman work, we recognized [in *Owens*] that such a rule cannot be categorical in the light of the DOL's crucial qualification that the application of the seaman exemption "depends *upon the character of the work* [an employee] actually performs and not on what it is called or the place where it is performed."

*Id.* at 280–81 (quoting 29 C.F.R. § 783.33) (emphasis and second bracket in *Coffin*).

Several critical factors distinguished the vessel-based tankermen in *Coffin* from the plaintiffs in *Owens*. They "ate, slept, lived, and worked aboard [the] towboats," and "worked at the direction of the captain." *Id.* at 282. Additionally, "their loading and unloading duties were integrated with their many other duties." *Id.* at 283. But most important of all, "safe loading and unloading contributed to the efficient movement of the barge." *Id.* at 282. Indeed, we have since interpreted the distinction between *Owens* and *Coffin* as coming down to "whether the 'primary purpose' of the particular individual's work is safe navigation of the ship." *Halle v. Galliano Marine Serv., L.L.C.*, 855 F.3d 290, 294 (5th Cir. 2017) (citing *Owens*, 272 F.3d at 703–04; *Coffin*, 771 F.3d at 283–84).

To underscore that importance, *Coffin* referred to the standards of 29 C.F.R. § 783.36 as a rebuttable "presumption that loading and unloading duties are nonseaman work because those duties are usually performed by harbor-based personnel who have little to no role in the barge's navigational mission." *Coffin*, 771 F.3d at 282 (citations omitted). That presumption was overcome by the undisputed evidence in *Coffin* that the "vessel-based tankermen performed their loading and unloading duties with an eye toward navigation *and* were required to perform such duties safely so that the vessel could safely operate on inland and oceanic waterways." *Id.* at 284.

No. 19-30907

2.

Here, the plaintiffs were not doing seamen's work when they were operating the cranes. Yes, they were "subject to the authority, direction, and control of the master" of the vessel. 29 C.F.R. § 783.31. Like the plaintiffs in *Coffin*, the employees here lived and worked on the liftboats and answered to the captain. But the parties do not dispute that part of the test.

The disputed question is whether their service operating the cranes was "offered to aid the vessel as a means of transportation." 29 C.F.R. § 783.31. It was not. To be sure, the plaintiffs performed many tasks that *do* satisfy that test. When the boats were underway, they acted as a normal nautical crew. And they remained responsible for their nautical tasks even when the boats were jacked up. They attended safety meetings, cleaned up the liftboats, and performed regular inspections. But unlike in *Coffin*, the plaintiffs' loading and unloading duties were not "integrated with their many other duties." *Coffin*, 771 F.3d at 283. Instead, once they finished their duties as the boat's crew, the plaintiffs turned their attention exclusively to operating the cranes. It was as though they were performing two discrete jobs: upkeep of the boat and operation of the crane.

The district court found that the "crane operations had implications for the seaworthiness and efficient movement of the vessel." That might be so, in the broadest sense; one false move of a hydraulic crane could certainly hazard the safety of the boat. Yet that invokes the same "broad and unsupportable construction" of the regulation that we rejected in *Owens*, 272 F.3d at 704. The fact that the liftboats moved under their own power does not change the nature of the crane operations, particularly because the plaintiffs operated them only while the boats were stationary. As we said in *Owens*, "unloading and loading . . . only prepares the vessel for navigation; it does not aid in its actual operation as a means of transportation." *Id.*

In any event, the record evidence suggests the real danger was to personnel, not the liftboats. The plaintiffs testified that it was critical to

operate the cranes safely, mostly to avoid striking any personnel with the crane basket. But this merely reinforces common sense. Unlike the tankerman in *Coffin* who "regularly walk[ed] his barge to make certain that the barge was level" for fear that it would "get stuck when traveling down a river or canal," *Coffin*, 771 F.3d at 283–84, the liftboat crew's safety concerns had less to do with the impact on the liftboats as boats than with the dangers incidental to hydraulic cranes as cranes. In short, the use of the cranes was not in furtherance of the "safe navigation of the ship." *Halle*, 855 F.3d at 294.

## C.

Additionally, the loading and unloading duties do not address the plaintiffs' other compelling framing of the issue: that they also used the cranes to support their customers' industrial activities on the oil platforms. The plaintiffs point to *W.D. Haden*, a case involving dredge boat crew members. Like the crew here and in *Coffin*, the dredge boat crew were "in the general sense seamen." *W.D. Haden*, 153 F.2d at 199. They lived on their vessels, stood watch, and could "be called on for any service like the ordinary sailor." *Id.* Their nautical work involved "management of the dredge boat and barges as vessels," whereas their industrial work involved "the mining and handling of shells . . . carried on by means of a floating mining plant." *Id.* We held that they were not exempt seamen under the FLSA because their industrial work "clearly" dominated, while their nautical work was "incidental and occasional, taking but a small fraction of the work time." *Id.*; *see* 29 C.F.R. § 783.34 (citing *W.D. Haden*).

All Coast argues *W.D. Haden* is "easily distinguished" because the dredge boats had no motive power of their own and were used only to dredge for shells. *See id.* at 197–99. That argument belies the finding that the crew indeed performed a nautical function; it was just outweighed by their industrial duties. *Id.* at 199. Still, it is undisputed that the employees in this case did not directly drill for oil and gas. Nor does All Coast directly collect

its customers' spoils. Instead, the charters pay All Coast for the support it renders, whether their drills produce oil or not.

But purely industrial activity is not required. In *Dole v. Petroleum Treaters*, this court held that plaintiffs who serviced and maintained oil wells were not exempt seamen, even though they "clearly [performed] some seamen duties in that they [operated] their vessels . . . between oil wells." *Dole*, 876 F.2d at 521. The plaintiffs spent at least half their time maintaining the wells. That, we held, entitled them to FLSA overtime under *W.D. Haden*. *Id.* All Coast is correct that the liftboat crews never left their boats or conducted maintenance on the oil platforms. But the liftboats spent even more time jacked up, adjacent to the oil platforms, than the *Dole* plaintiffs spent maintaining oil wells. *See id.* And there is no question that the liftboat crews used the cranes to support their customers' maintenance efforts. They delivered equipment to the platforms, held casings in place, placed divers in the water, and retrieved equipment that the divers placed in the crane baskets. Like the plaintiffs in *W.D. Haden* and *Dole*, these were industrial activities that had no bearing whatsoever on the liftboats' operation or navigation.

The Seventh Circuit's analysis in *Harkins v. Riverboat Services*, 385 F.3d 1099 (7th Cir. 2004), is also instructive. There, the plaintiffs were crewmembers of a gambling riverboat. "[T]hey were not waiters or croupiers, but instead were responsible for the operation of the ship." *Harkins*, 385 F.3d at 1100. But a curiosity of the ship's operation was that it spent "at least 90 percent of its time moored to a pier in East Chicago." *Id.* As a result, "their life differ[ed] only slightly from that of ordinary casino workers." *Id.*

The Seventh Circuit noted that the seaman exemption would not apply "in a case in which a person employed on a ship was engaged in activities that had no maritime tincture whatever." *Id.* at 1103; *see* 29 C.F.R. § 783.34 ("Concessionaires and their employees aboard a vessel" are generally not seamen.). But "none of the plaintiffs [was] a croupier, cashier,

bouncer, dealer, waiter, or entertainer; all [were] . . . members of the ship's operating crew." *Id.* So the court posed this critical question:

> We can ask the question this way: do the plaintiffs spend their time performing duties that are necessary to the operation of the *Showboat* because it is a ship or because it is a casino? A blackjack dealer does not become a seaman by virtue of leaving his job at Harrah's land-based casino and taking a job at Harrah's riverboat casino, but likewise a helmsman does not cease to be a seaman because he transfers to a casino boat that spends most of its time moored.

*Id.* at 1104 (citation omitted).[5]

When we pose the same question here, the answer becomes obvious. Surely the crew members were not performing duties that were necessary to the operation of the liftboats as boats, but merely as platforms for the hydraulic cranes. If the crew had *only* serviced the liftboats while they stood stationary next to the oil platforms, that would have been seamen's work without question. *See id.* at 1104. But their use of the cranes had nothing to do with the operation of the liftboats—other than the obvious fact that they had brought the cranes with them. There is no evidence in the record from which we could conclude that those activities aided the liftboats at all as a means of transportation. Those tasks do not even meet the failed standard that they "*prepare[d]* the vessel for navigation." *Owens*, 272 F.3d at 704.

Accordingly, we hold that the plaintiffs' crane operation was not seaman work for purposes of the FLSA exemption. Whether the plaintiffs qualify for the exemption otherwise will be decided on remand. The district court thus erred in granting summary judgment for All Coast. As the district court said, because of the substantial amount of time the plaintiffs spent operating the cranes, "if crane operation—in this context—is not seaman's

---

[5] The plaintiffs' appeal in *Harkins* followed a jury's verdict in favor of the riverboat company, finding the plaintiffs were exempt seamen. 385 F.3d at 1101.

work[,] then Plaintiffs . . . cannot qualify as seamen." It was not, and they cannot—not while they were operating the cranes. We remand to the district court for further proceedings consistent with our holding.

## D.

It follows that All Coast was not entitled to summary judgment as to the cooks either. Like any other crew member, a cook is a seaman "if, as is the usual case, [his] service is" "rendered primarily as an aid in the operation of such vessel as a means of transportation, provided he performs no substantial amount of work of a different character." 29 C.F.R. §§ 783.31, 32. "A cook is *usually* a seaman because he usually cooks *for* seamen." *Martin v. Bedell,* 955 F.2d 1029, 1036 (5th Cir. 1992). But this is not the usual case for two reasons.

*First*, the district court must consider this question again in view of our holding that the liftboat crew members were not engaged in seamen's work when operating the hydraulic cranes. Our statement in *Martin* recognized a cook's service to the vessel as a means of transportation by way of the crew he feeds. *See id.* If that crew is not serving the vessel as a means of transportation, then neither is the cook. Just as there is a fact issue on remand about the amount of time the crew spent operating the cranes, there is a corollary question about the amount of time the cooks spent in service to the vessel as a means of transportation.

*Second*, the district court must also consider how much time the cooks spent preparing food for All Coast's chartered passengers. The district court concluded in its summary judgment opinion that the cooks were seamen because "for every meal [they] cooked, All Coast crew members ate." But even if the crew members were exempt seamen (which we have held they were not), that finding alone does not support summary judgment. The question is not so simple as whether All Coast crew members ate some of the food at each meal the cooks prepared. Instead, the question is whether the cooks rendered a service that was "*primarily* [an] aid in the operation of such

vessel as a means of transportation, provided [they] perform[ed] no *substantial* amount of work of a different character."  29 C.F.R. § 783.31 (emphasis added).

The regulations adopt a position that "such differing work is 'substantial' if it occupies more than 20 percent of the time worked by the employee during the workweek."  *Id.* § 783.37.  We have often recognized that 20 percent figure as a guide, even if we have not been quite so mathematically precise.  In *Martin*, we adopted the 20 percent figure outright when we remanded to the district court to "determine if the cooks spent more than 20 percent of their time preparing food for non-crew members." *Martin*, 955 F.2d at 1036 (cleaned up).  In *Owens*, we applied a more flexible approach that eschewed "apply[ing] the twenty percent rule in a strict, mechanical fashion."  *Owens*, 272 F.3d at 702 n.5.[6]  And in both *Coffin* and *Halle*, we considered whether non-seaman's work made up more than "approximately" 20 percent of an employee's time.  *See Halle*, 855 F.3d at 296 (citing *Coffin*, 771 F.3d at 279–80).  With the regulatory cutoff as a guide, a cook who spends more than roughly 20 percent of his time cooking for non-crew members or, as here, crew members who are non-exempt seamen, has spent a "substantial" amount of time on differing work.  29 C.F.R. § 783.31.

The district court's initial inquiry did not address that question.  It was not enough to say that the liftboat crew members ate at each meal the cooks prepared, because that did not address the amount of time the cooks

---

[6] Our concern in *Owens* may have been colored by a conflation of the FLSA's seaman exemption and seaman status under the Jones Act.  As we have said, "the definition of 'seaman' in the Jones Act is not equivalent to that in the FLSA."  *Halle*, 855 F.3d at 294 (citing *Dole*, 876 F.2d at 520).  Thus, we should not have been concerned in *Owens* that crew members who spent more than 20 percent of their time on differing work would "lose their seaman status for the few weeks a year their vessels were in port."  *Owens*, 272 F.3d at 702 n.5.  That concern betrayed a Jones Act inquiry irrelevant to the crew members' entitlement to overtime pay under the FLSA, a betrayal emphasized by our citation to *Chandris v. Latsis*, a Jones Act case.  *See id.* (citing *Chandris v. Latsis*, 515 U.S. 347, 371–72 (1995)).

No. 19-30907

devoted to the task.  The liftboats were usually manned by a crew of four. It is unclear from the record how many passengers they typically chartered to the rigs.  But suppose that there was an equal number of passengers and crew. Or, just as likely, suppose that the passengers outnumbered the crew. Perhaps a cook who must prepare food for the crew can double or triple his output without substantially increasing the cooking and prep time.  Then again, perhaps not.

These fact questions preclude summary judgment for All Coast.  On remand, the district court will need to determine how much time the cooks spent preparing food for the crew when they were not performing seamen's work, and how much time they spent preparing food for non-crew members. If that adds up to a "substantial" amount, then they, like the crane-operating crew members, were not doing seamen's work.  *See* 29 C.F.R. § 783.31; *Martin*, 955 F.2d at 1036.

## IV.

For the foregoing reasons, we REVERSE the district court's summary judgment and REMAND the case for further proceedings.

No. 19-30907

Edith H. Jones, *Circuit Judge*, joined by Elrod, *Circuit Judge*, dissenting:

For the second time in two months, this court flouts *Encino Motorcars, L.L.C. v. Navarro*, 138 S. Ct. 1134 (2018). There, rectifying decades of misreading, the Supreme Court held that the Fair Labor Standards Act exemptions call for a fair—not narrow—reading. *Id.* at 1142. Vague notions of the FLSA's remedial purpose, the Court noted, could not support the lower courts' atextual narrow-construction principle. *Id.* After all, FLSA exemptions serve no purpose when the courts' tendentious and incomplete readings of statutory and regulatory text encourage costly litigation and the threat of large damages the Act authorizes.

But this court has not figured that out. Recently, this court misinterpreted the executive, administrative, and professional exemption, 29 U.S.C. § 213(a)(1), and its accompanying regulations, 29 C.F.R. §§ 541.0-541.710, to award overtime to an offshore oil toolpusher who managed at least a dozen employees and earned over $200,000 annually. *Hewitt v. Helix Energy Sols. Grp.*, No. 19-20023, 2021 WL 4099598 (5th Cir. Sept. 9, 2021) (en banc). Today's victim is the "seaman" exemption, 29 U.S.C. § 213(b)(6), and its regulations, 29 C.F.R. §§ 783.0-783.51. At least the employer here has a chance to persuade a jury that its liftboat crewmembers are exempt seamen— but the panel's broad holding threatens uncertainty throughout the maritime industry.[1]

---

[1] *See* Br. of Amici Curiae, Offshore Marine Serv. Ass'n and Nat'l Ocean Indus. Ass'n in Support of Applicant for Reh'g En Banc, *Adams v. All Coast, L.L.C.*, No. 19-30907, Doc. No. 515799315 (5th Cir. Mar. 29, 2021); Amicus Curiae Br. of the Am. Maritime Ass'n in Support of All Coast, L.L.C.'s Pet. For Reh'g En Banc, *Adams v. All Coast, L.L.C.*, No. 19-30907, Doc. No. 515799406 (5th Cir. Mar. 29, 2021).

No. 19-30907

The plaintiffs are Coast Guard licensed mariners who served as mates, deckhands, ordinary seamen, and able-bodied seamen aboard All Coast's lift-boats.[2] A liftboat is an "offshore supply vessel with moveable legs capable of raising its hull above the surface of the sea." 46 C.F.R. § 90.10-20. They are considered "vessels" in navigable water, even when in the jacked-up position. *Strong v. B.P. Expl. & Prod., Inc.*, 440 F.3d 665, 669 (5th Cir. 2006). A crew of about six navigates these large, special-purpose vessels far out into the Gulf of Mexico to deliver or retrieve supplies, workers, and machinery, just like any other commercial vessel. Voyages are typically 14-day hitches, during which the plaintiffs live, sleep, and work on board under direction of the vessel's captain. The liftboats' mission and navigation are coterminous with trips to and from port.

At their offshore destinations, liftboats use cranes to move cargo and personnel from the liftboats' deck to oil platforms. In addition, the cranes may assist in diving and other oil production operations. But even when the liftboat is jacked up, the crewmembers retain responsibility for standing lookout, checking the engine room, splicing rope, cleaning, and performing other quintessential seaman's work. Crewmembers, therefore, alternate in working the cranes and serving other vessel functions.

As is the case for all commercial vessels, a raft of Coast Guard regulations governs liftboats. *See* 46 C.F.R. §§ 134.100-134.180. With their legs

---

[2] My critique applies equally to the plaintiffs that served as cooks. For them, the panel opinion looks to *Martin v. Bedell*, 955 F.2d 1029 (5th Cir. 1992). The court there held that a "cook is *usually* a seaman because he usually cooks *for* seamen," but recognized that may not always be the case. *Id.* at 1036 (emphasis in original). The panel directs the district court to consider whether the cooks spent a substantial amount of time serving non-seamen but gives little direction on what that means. *Ante*, at 17-19. Does it mean the employer must compare the servings of stew given to the crew qua seamen versus the crew qua non-seaman? Or whether all dine at the same table? Either way, the inquiry is unwieldy.

21

No. 19-30907

precariously planted hundreds of feet down on the soft seabed, the liftboats' stability is a matter of paramount importance to avoid capsizing[3] or experiencing "uncontrolled descent" from the jacked-up position, 46 C.F.R. § 134.150, a hazard that can occur from mechanical failures or unbalanced loads on deck. Crew safety is also critical, as the loss or incapacitation of a single crewmember may render the vessel unable to move according to Coast Guard regulations.[4]  46 C.F.R. § 15.501.

The FLSA exempts from minimum wage requirements any person "employed as a seaman." 29 U.S.C. § 213(b)(6). A series of regulations, largely intact since the Act's early days, governs the exemption.[5] 29 C.F.R.§§ 783.0-783.51. Courts look to the ordinary meaning of "employed as a seaman," which entails a functional analysis of an employee's work.[6] As a result, each case depends on its particular facts. *Coffin v. Blessey*

---

[3] *See Marine Accident Brief, Overturning of the Liftboat Kristin Faye*, Nat'l Transp. Safety Bd. (Nov. 4, 2020), https://www.ntsb.gov/investigations/AccidentReports/Reports/MAB2036.pdf (detailing how a liftboat capsized as a result of the crew's failure to conduct adequate pre-load tests before engaging in crane operations).

[4] Other regulations govern the structural standards necessary to handle adverse conditions, 46 C.F.R. § 134.140, and the contents of a liftboat's operating manual, 46 C.F.R. § 134.170, which, among other things, must include "[d]esigned limits for each mode of operation" like wave height and period, wind, current, temperatures, and "[o]ther environmental factors."

[5] In 1961, among other changes, seamen on American vessels were brought within the Act's minimum wage coverage, but they remain outside the overtime provision. 29 C.F.R. § 783.28. Speculation is that the differing conditions of work "between maritime and landside labor" led to seamen's continued exemption from overtime. *Tate v. Showboat Marina Casino P'ship*, 431 F.3d 580, 584 (7th Cir. 2005) (Posner, J.).

[6] *See Gale v. Union Bag & Paper Corp.*, 116 F.2d 27, 27-28 (5th Cir. 1940) ("The word 'seaman' has a plain, ordinary meaning universally applied. Whether a person is a seaman depends upon the character of his duties. If they are maritime in character and rendered on a vessel in commerce, in navigable waters, he is a seaman.") (citing *Int'l Stevedoring Co. v. Haverty*, 272 U.S. 50, 47 S. Ct. 19 (1926)); *see also* 29 C.F.R. § 783.29(b) ("the exemption was intended to exempt employees employed as 'seamen' in the ordinary

*Marine Servs., Inc.*, 771 F.3d 276, 280 (5th Cir. 2014) (citation omitted).  And the employer bears the burden of showing employees are exempt.  *Faludi v. U.S. Shale Sols., L.L.C.*, 950 F.3d 269, 273 (5th Cir. 2020).

All Coast argued, and the district court agreed as a matter of law, that the plaintiffs are exempt as persons "employed as seamen," in the ordinary meaning of that phrase, because crane operation is integral to the mission, transportation function, and seaworthiness of the liftboats.[7]  I agree.  The regulations support All Coast's characterization of the plaintiffs as exempt seamen.  The panel's errors lie in (a) artificially compartmentalizing the crewmembers' tasks into those connected with sailing the vessels and operating the cranes and (b) analogizing liftboat crane operations to "industrial work" like dredging.

Start with the general definition:  "an employee will ordinarily be regarded as 'employed as a seaman' if he performs, . . . subject to the authority, direction, and control of the master aboard a vessel, service which is rendered primarily as an aid in the operation of such vessel as a means of transportation, provided he performs no substantial amount of work of a different character."  29 C.F.R. § 783.31.  More specifically, the "term 'seaman' includes members of the crew such as sailors, engineers, radio operators, firemen, pursers, surgeons, cooks, and stewards if, as is the usual case, their service is of the type described in § 783.31. . . . However, an employee employed as a seaman does not lose his status as such simply because, as an incident to such

---

meaning of that word"); *Coffin v. Blessey Marine Servs., Inc.*, 771 F.3d 276, 281 (5th Cir. 2014) ("This reading is consistent with our own precedent in which we attempt to give the term seaman its ordinary meaning").

[7] Ordinary Seaman Migues testified, for instance, that in operating the crane, it is important to be mindful of environmental conditions like the weather and the sea. ROA.2382.  Other crewmembers emphasized hazards to the cargo and to personnel on both the liftboat and the receiving platform or vessel.  ROA.2408.

employment, he performs some work not connected with operation of the vessel as a means of transportation, such as assisting in the loading or unloading of freight at the beginning or end of a voyage . . . ." 29 C.F.R. § 783.32. The regulations continue by stating that "[m]erely because one works aboard a vessel . . . , or may be articled as a seaman . . . , or performs some maritime duties . . . , one is not employed as a seaman . . . unless one's services are rendered primarily as an aid in the operation of the vessel as a means of transportation." 29 C.F.R. § 783.33. Finally, the regulations specify that some employees aboard vessels are not "employed as seamen," for example, "[c]oncessionaires and their employees" and those working on floating construction equipment or a dredge. 29 C.F.R. § 783.34.

Fairly read, the regulations show that these plaintiffs are employed as seamen. Sections 783.31 and 783.32 create a strong presumption that the plaintiffs are employed as seamen because liftboat employees are crewmembers of a vessel, subject to a captain's authority, travelling on 14-day voyages to transport goods, personnel, and equipment offshore as well as assist in oil and gas operations. The crane operations are a sine qua non of the liftboat's function as a means of transportation; without the cranes, the liftboat serves no transportive purpose. And even when the liftboat is jacked up, the crewmembers continue to have seaman responsibilities other than their crane work. The panel's piecemeal treatment of the plaintiffs' duties ignores the intimate connection between the crane work and the liftboats' purpose as a means of transportation. Moreover, § 783.32 deems as "seamen" those employees who bear conventional maritime titles and roles (i.e. common law seamen), like these plaintiffs. That provision emphasizes that incidental work like loading or unloading the vessel at the beginning or end of a voyage does not disqualify traditional crewmembers from the seaman exemption. Thus, even if the employees perform certain crane operations when the liftboat is preparing to leave port or after it arrives in port, the common law

seamen are still exempt seamen. *See, e.g.*, *Coffin*, 771 F.3d at 282-84 (holding that vessel-based tankermen were employed as seamen when their duties included loading and unloading the barges, a task integrally connected to the barge's seaworthiness). Finally, § 783.33 identifies three characteristics of seaman's work, none of which alone shows that a person is employed as a seaman, but the plaintiffs and their work involve all three characteristics—voyaging aboard the liftboats, being articled seamen, and performing maritime duties. In short, the plaintiffs fit squarely into the regulations' definition of "employed as a seaman."

The regulations also explain types of employees who are not "employed as seamen," and the plaintiffs are not those types. Persons not "employed as seamen," include employees "engaged in the construction of docks, levees, revetments, or other structures, and employees engaged in dredging operations or in the digging or processing of sand, gravel, or other materials." 29 C.F.R. § 783.34. The regulations also exclude employees engaged in stevedoring or longshoring activities, 29 C.F.R. §§ 783.33, 783.38, and "concessionaires and their employees," 29 C.F.R. § 783.34; employees aboard vessels who are primarily engaged in performing such work are not within the seaman exemption.[8] It is absurd to class the plaintiffs here with those types of employees given these plaintiffs' constant attention to the performance of the liftboats qua vessels.[9] Insofar as the plaintiffs here are

---

[8] The panel seriously erred, in my view, by analogizing this case to *Owens v. SeaRiver Maritime, Inc.*, 272 F.3d 698 (5th Cir. 2001), in which the plaintiffs were land-based workers who principally removed petroleum products from moored barges, like stevedores. Operating cranes from a liftboat at sea is entirely different from sucking petroleum products out of docked barges.

[9] Another helpful juxtaposition, explained by a sister circuit, is between the waiters and blackjack dealers on a floating, but largely stationary, casino boat, who are not exempt seamen, and the vessel's "marine crew," who, as a jury found, are exempt seamen. *Harkins v. Riverboat Servs. Inc.*, 385 F.3d 1099, 1104 (7th Cir. 2004).

articled seamen, undertaking voyages at the captain's command, and responsible for the vessel, their duties manifestly include the vessel's safe operation when discharging cargo or personnel, regardless whether the liftboat is positioned on the seabed or moored near the receiving platform.

Read holistically, the regulations do not preclude considering plaintiffs' crane operation as part of their overall seaman's duties; factually, there is more than enough to consider those operations as integral to the liftboats' transportation function. After all, if the cargo cannot be delivered at sea, the liftboat has no role. As a result, the panel's focus on the plaintiffs' contention that they spent more than 20 percent (and allegedly up to 90 percent) of their workday aboard the liftboats operating the cranes is misplaced. And anyway, that contention arises from self-serving deposition testimony and is subject to further examination at trial.[10]

The panel's decision is novel. Research has not uncovered a single case in which a blue-water crewmember, like the articled-mariner plaintiffs here, was held not to be an exempt seaman. The regulations in fact presume that crewmembers are "ordinarily" exempt seamen and may perform incidental loading or unloading activities while maintaining that status. 29 C.F.R. §§ 783.31, 783.32. The panel's analysis thus stands in serious tension with a reasonable and holistic interpretation of FLSA regulations. Moreover, this decision has far-reaching consequences for the liftboat industry. The panel appears to allow workers to walk in and out of FLSA exempt status

---

[10] Moreover, the regulation from which the 20% guideline derives, 29 C.F.R. § 783.37, concerns the amount of work per week that may be deemed substantial "non-seaman's work" for the government's "enforcement purposes." *Id.* So, as the panel seems to agree, the 20 percent guideline is just that, a guideline. *Ante*, at 18.

and thereby necessitates detailed and, frankly, meaningless timekeeping ordeals aboard ship. [11]

One may reply to this dissent that the regulations are the regulations, and a "textual" approach is all that matters. But, of course, what text matters most is the question here. In dissenting, I rely on the fact-specific approach and careful delineation of exceptions to the seaman exemption that the regulations embody. Moreover, if the result of the panel's narrow "textual" reading of these regulations is to splice and dice the seaman exemption into portions of "seaman" and "non-seaman" work within the space of each voyage—then the exemption is practically worthless.

That this case will go to a jury for ultimate resolution of the exemption offers some comfort, perhaps, to All Coast, but to the maritime industry as a whole, legitimate and longstanding expectations as to the FLSA's seaman exemption have been upended. I respectfully dissent from the failure to rehear this case en banc.

---

[11] For instance, the regulations plainly state that loading or unloading can be incidental to bona fide exempt seaman status, 29 C.F.R. § 783.32, but where does the panel opinion leave an employer? Can loading or unloading be seaman work *unless* it is unloading material onto an offshore platform, at which point it becomes non-exempt "industrial" work? Or, though loading or unloading work at the platform can be seaman work, is using cranes to hold coil tubing units or lower divers into the water to retrieve equipment never seaman work? If the latter is the panel approach, would that not require a granular assessment of the relative percentages of "industrial" crane work versus "incidental" loading or unloading? From a larger perspective, must the crane work be accounted for daily, weekly, or on a voyage-by-voyage basis? And how, under any of these scenarios, will the employer reasonably be able to comply with the FLSA other than to ignore the seaman exemption?